Plaintiff is entitled to recover $34,-831.72.

**EVERETT PLYWOOD CORPORATION**

v.

**The UNITED STATES.**

No. 743–71.

United States Court of Claims.

Feb. 19, 1975.

James F. McAteer, Seattle, Wash., for plaintiff. Emmett G. Lenihan, Seattle, Wash., atty. of record. William F. Lenihan, Seattle, Wash., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's and defendant's exceptions, filed October 1, 1974, and October 30, 1974, respectively, to the recommended decision of Trial Judge Hal D. Cooper, filed July 12, 1974, pursuant to Rule 134(h). The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the recommended decision of the trial judge, with minor modifications by the court, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, it is concluded that plaintiff is entitled to recover in accordance with the opinion and judgment is entered for plaintiff in the sum of $34,570.83.

Trial Judge Cooper's opinion, with minor modifications by the court, is as follows:

This action asserts a breach by the Forest Service of a contract for the sale of timber on Tonga Ridge. It is a sequel to the court's earlier decision in Everett Plywood & Door Corp. v. United States, 419 F.2d 425, 190 Ct.Cl. 80 (1969), hereinafter referred to as Tonga I. In Tonga I, the court found a breach of warranty of quantity for which plaintiff was awarded damages. The present case asserts an additional breach of the same contract based on defendant's refusal to grant an extension thereof which would have allowed plaintiff to cut the remaining timber on Tonga Ridge. In addition, plaintiff seeks recovery of certain road repair and maintenance costs it incurred in the performance of the contract.

In defense, it is contended that plaintiff has so split its cause of action that, by reason of the court's judgment in Tonga I, plaintiff is barred from any further relief. Also defendant denies there was any breach of the contract and denies that plaintiff is entitled to any recovery whatsoever.

The facts regarding the contract were fully stated in Tonga I and will be restated here only to the extent necessary to an understanding of the parties' contentions. The original term of the contract, executed in 1955, extended to December 31, 1960. When plaintiff commenced logging, excessive defects in the timber were discovered, resulting in a substantial underrun. It was this underrun that was the basis for the Tonga I case. During the pendency of that suit, filed in 1964, plaintiff was granted successive extensions of the contract and

logging continued through the 1967 season. By that time, the only remaining timber was on Unit 15 of Tonga Ridge.

In requesting an extension of the contract for the 1968 season, plaintiff assigned as the reason therefor the difficulties presented by the short logging season at the high elevation at which Unit 15 was located and closed its request with the statement that "we should have no trouble completing the sale this coming season."

The Forest Service's policy governing extensions, both when the contract was entered in 1955 and when plaintiff's request for 1968 was made, was a very liberal one. The Forest Service Handbook stated it in the following terms:

> 2433.12—*Procedure.* Ordinarily, the timber sale contract is written on the basis that time is not of the essence. The termination date is fixed when the sample contract is drafted and thus becomes a condition of sale, * * an extension of time may be granted by the officer approving the sale, his successor, or his superior, unless disadvantageous to the United States.

Extensions were regularly granted for a variety of reasons ranging from bad weather to poor economic conditions. Forest Service personnel testifying at trial could recall no specific instance where, prior to 1969, an extension had been denied and plaintiff had never been denied an extension on any of its other Forest Service contracts. The fact is that extensions of contracts were granted by the Forest Service with very little urging.

On April 8, 1968, the Forest Service granted plaintiff's request for an extension, but warned plaintiff that "only under extraordinary conditions will this sale be considered for another extension."

Plaintiff attempted but failed to complete logging on Unit 15 in the 1968 season. Although a number of excuses were given, it is doubtful, in view of the normally adverse conditions prevailing at high elevations, that any of the difficulties encountered by plaintiff were truly "extraordinary."

In November 1968, prior to any request by plaintiff, the Forest Service decided to grant no further extensions of the contract. This decision was communicated to plaintiff on December 20, 1968. By letter of January 24, 1969, plaintiff formally requested an extension of the contract for the 1969 season. There then followed a series of events, summarized in finding 19, the net result of which was the grant of a one-month extension of the contract from March 31, 1969 to April 30, 1969, followed by a final refusal, on April 22, 1969, of any further extension. Meanwhile, on March 20, 1969, the trial judge's decision in Tonga I was handed down.

When its request for reconsideration of the Forest Service's decision was denied, plaintiff appealed to the Board of Forest Appeals which, ultimately, dismissed the appeal on the ground it had lost jurisdiction by reason of the subsequent resale of the timber on November 30, 1969, by the Forest Service. The Board's dismissal occurred on February 2, 1971, some 14 months after the court's per curiam affirmance of the trial judge's decision in Tonga I.

## I. The Split Cause of Action Defense

On the foregoing facts, defendant contends that plaintiff has split its cause of action and is barred from any further relief.

In Nager Electric Co. v. United States, 368 F.2d 847, 177 Ct.Cl. 234 (1966), the court, in considering the issue of statute of limitations, stated the controlling principle governing the rule against split causes of action:

> For reasons of judicial economy, convenience, and fairness to litigants, it is important to retain the principle that one nondivisible contract normally gives rise to only one claim, not to a succession of individual-item claims with all the burdens they would bring and problems they would entail. *Supra*, 368 F.2d at 861, 177 Ct.Cl. at 254.

See, also, Restatement, Judgments § 62 (1942).

■ Nonetheless, a separate action founded on a single nondivisible contract may be maintained if the later claim is severable from the earlier one, and, if at the time of commencement of the earlier suit, the later claim was not then capable of being asserted. United States v. Pan-American Petroleum Co., 55 F.2d 753, 777 (9th Cir. 1932), cert. denied, 287 U.S. 612, 53 S.Ct. 14, 77 L.Ed. 532; Fellows v. National Can Co., 13 F.2d 210, 211 (E.D.Mich.1926); Restatement, Judgments § 62, example (h.) (1942).[1] However, if the claimant, before filing its first suit, is in possession of all the facts on which its second suit is based, the splitting of the claims into multiple suits is fatal to maintenance of the later-filed action. Container Transport International, Inc. v. United States, 468 F.2d 926, 199 Ct.Cl. 713 (1972).

In this case, essentially three claims are presented, the principal one being based on the Forest Service's refusal to grant an extension. A final decision on the request for an extension was not made until April 22, 1969, and the contract did not expire until April 30, 1969. Obviously, until the Forest Service had finally refused an extension, any claim based on a refusal to extend the contract would have been premature. Hence, it appears that it was not until April 22, 1969, at the earliest, that the extension claim accrued. The road repair claim arose in late 1968 and the road maintenance claim did not accrue until after the contract had expired.

Thus all of the claims now asserted arose some four or more years after the first suit had been filed and subsequent to the trial held in 1967 in Tonga I. Moreover, two of the three claims accrued after the opinion of the trial judge had been filed in the earlier case.

■ It is recognized that this court's holding in Electric Boat Co. v. United States, 81 Ct.Cl. 361 (1935), cert. denied, 297 U.S. 710, 56 S.Ct. 573, 80 L.Ed. 997 (1936), requires a litigant to seek to amend a pending suit to add later accruing claims under a single contract if he is to avoid dismissal of a later suit on the ground he has split his cause of action.[2] However, defendant has cited no authority, and none has been found, to support the proposition that the obligation to amend extends to claims accruing after a trial has been held and after the trial judge's decision has been rendered. While, in an appropriate case, it may be desirable even under those circumstances for a party to seek to amend, it does not follow that judicial economy, convenience, and fairness to litigants will always be served by imposing such a requirement either on the parties or the court.

■ In the context of this case, the Forest Service notice in December 1968 that no further extensions would be granted was the first indication to plaintiff that it may have another claim against defendant. At that point, plaintiff had several options. Plaintiff might have treated the communication as a breach, but because trial was completed and briefs had been filed in Tonga I, it would have had either to file a new petition or seek leave to amend the pending suit. Had the latter course been followed, and assuming such a belated request had been allowed, it still would have entailed additional discovery, a second trial in Seattle, Washington, and additional briefs by the parties. The alternative, and the one followed by plaintiff, was to seek resolution of the issue by asking the Forest Service to reconsider its position in light of specific reasons

---

1. The proposed revision of the Restatement takes the same position with respect to successive breaches of a contract. Restatement (Second) Judgments § 61.2, pp. 132–33 (Tent. Draft No. 1, 1973).

2. *Electric Boat* was concerned with the effect of pursuing permissive administrative relief instead of seeking to amend to assert the claim in a pending suit. It is unclear from the evidence in the instant case precisely what claims plaintiff presented to the Board. It appears that the road claims never were presented and, of course, the breach claim for damages was beyond the Board's jurisdiction. Accordingly, in considering this issue, it has been assumed that the relief sought from the Board was permissive.

supporting the request for an extension. The latter approach was entirely reasonable and in keeping with the notion that parties should be encouraged to resolve their differences rather than rushing into court at the first hint of a claim.

By April, when the Forest Service had rejected the formal request for an extension, matters had changed somewhat. By that time, both parties were aware of the trial judge's decision and, as more fully discussed *infra,* the implicit assumption therein that plaintiff would receive all of the timber yet to be cut on Tonga Ridge. At that point, it would not have been inappropriate to bring the evolving controversy to the court's attention.

Neither party did so and, since the assumption in the trial judge's decision as to the volume of timber plaintiff would cut was only indirectly related to the computation of damages and had no effect at all on the issue of defendant's liability,[3] it is understandable that they did not. Moreover, in view of the advanced stage of Tonga I, there would have been little, if any, savings in terms of convenience and expense to the litigants had they done so. The only potential saving is that, had the court been made aware of the additional claim by, say, May 1969, it might have suspended its review of the trial judge's decision pending a trial and decision on the additional count, thereby combining all matters in a single review. However, balanced against that saving is the substantial additional delay plaintiff would have encountered in obtaining a recovery on its breach of warranty claim.

██ Under the circumstances present in this case, it is concluded that it would be an unwarranted extension of *Electric Boat* to hold that plaintiff's failure to

seek to assert the present claims in Tonga I bars it from any further relief. Accordingly, the defense based on splitting of the cause of action is denied.

## II. The Refusal to Extend Claim

Plaintiff contends that defendant's refusal to grant a further extension of the contract which would have enabled it to cut the timber on Unit 15 was arbitrary and capricious and constituted a breach of the contract. Defendant denies that this is so, maintaining that the refusal was entirely proper in view of plaintiff's inability to perform the contract.

While plaintiff apparently construes the contract, particularly in light of the decision in Tonga I, as giving it an unfettered, absolute right to the timber remaining on Unit 15, neither the contract itself nor the court's earlier decision supports such a position. In Tonga I, the court was concerned with timber that defendant had warranted to be present but was not; here, the issue is as to timber that was present but which plaintiff did not receive. Although the court clearly assumed that plaintiff would receive all of the timber yet to be cut, nothing that was said in Tonga I can be construed as a holding that defendant was obliged to extend the contract *ad infinitum.*

That the original term specified in the contract, 5 years, was unrealistically short is undisputed. The parties contemplated, at the time of entering into the contract, that extensions of the term would be requested by plaintiff and granted by defendant. However, the contract itself offers no guidelines by which to govern the grant of those extensions.

But the evidence is clear that, at the time the contract was executed, the For-

---

**3.** Tonga I was only concerned with timber warranted to be present but which in fact was not. In computing damages for the breach of warranty, it was necessary to determine the quantity of timber present on Tonga Ridge and then determine the damages to plaintiff, based on the difference between the timber that was there and the timber warranted to be there. In so doing, it was assumed that plaintiff

would receive all of the timber that was present and the award of damages was based only on the missing timber. However, in making that assumption, the court credited plaintiff with recovering certain costs which, as appears *infra,* it in fact did not recover due to its failure to receive all of the timber present on Tonga Ridge.

est Service had a well-established practice or custom with respect to granting extensions. As noted previously, this practice was a very liberal one in which extensions were granted with very little urging by the contractor, and plaintiff was well aware of that practice. In practical operation, extensions of contracts were always granted by the Forest Service unless there was a demonstrable disadvantage to the United States.

■ An oft-used principle in contract law is that where a well-established practice or custom is shown to exist, it is assumed that the parties to a contract intended that practice or custom to apply, in the absence of express language in the contract to the contrary. Robinson v. United States, 80 U.S. (13 Wall.) 363, 366, 20 L.Ed. 653 (1871); John McShain, Inc. v. United States, 462 F.2d 489, 199 Ct.Cl. 364 (1972); Buffalo Merchandise Warehouses, Inc. v. United States, 88 F.Supp. 276, 277, 115 Ct.Cl. 568, 572 (1950). Also, regulations in effect at the time of a contract are a useful guide in the resolution of a contract case. Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 195 Ct.Cl. 21 (1971). Here, usual custom or practice was for the Forest Service to set a fixed term for performance; however, it was recognized by the parties that time was not of the essence and it was the practice of the Forest Service that the term originally set would be liberally extended in accordance with published Forest Service regulations. Those regulations, together with the custom of the Forest Service in granting extensions for a variety of reasons, make it clear that extensions would be granted, upon request, unless, as stated in paragraph 2433.12 of the Forest Service Handbook, it would be "disadvantageous to the United States."

■ In entering into this contract, plaintiff had every reason to assume, there being nothing in the contract to the contrary, that it would receive extensions in accordance with the prevailing custom or practice. Indeed, the evidence is that, from 1960 to 1968, plaintiff did receive extensions on that basis. The rights and obligations of the parties under the contract must, therefore, be construed in light of this established practice or custom. Stoeckert v. United States, 391 F.2d 639, 647, 183 Ct.Cl. 152, 165 (1968). If, in refusing to extend the contract for 1969, defendant departed from that practice, and in fact used a different basis in passing on the requested extension, plaintiff's claim for breach is sustainable. Cf. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Specifically, the question is whether defendant denied the extension because it was "disadvantageous to the United States" or on some other, and materially different, basis.

■ Although the warning in 1968 that no further extensions would be granted except "under extraordinary conditions" is not itself inconsistent with a determination by the Forest Service that further extensions would be disadvantageous to the United States, there has been no showing that the Forest Service evaluated the matter in that context. From the evidence, it appears that the warning was principally based on the belief that plaintiff would not make any effort to clear the remaining timber from Unit 15 until after the court's decision in Tonga I. However, even if the belief were correct, there is no evidence that the Forest Service made any determination that such inactivity by plaintiff would be disadvantageous to the United States.[4] In any event, and more importantly, testimony at trial revealed that this belief was based on no facts whatever and was sheer speculation by some of the Forest Service personnel. A standard of "disadvantageous to the United States" vests wide discretion in defend-

---

**4.** Although there is some indication the Forest Service wanted the timber cut so as to provide accurate information for use in Tonga I, the insubstantial nature of that interest is revealed by the fact the Forest Service had no intent to reoffer Unit 15 after plaintiff's contract was allowed to expire.

ant in passing on requests for extensions. Even so, the exercise of that discretion must be fair and reasonable, not arbitrary and capricious. Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 998, 184 Ct.Cl. 169, 184 (1968); Gadsden v. United States, 78 F.Supp. 126, 128, 111 Ct.Cl. 487, 490 (1948). To impose, unilaterally, an additional condition on further extensions merely on the basis of speculation is neither fair nor reasonable and is contrary to defendant's obligation to administer the contract in an evenhanded manner consistent with its well-established practices and published regulations.

What has been said, of course, does not establish an actionable breach for if, in refusing an extension for the 1969 season, defendant fairly determined that a further extension would be disadvantageous to the United States, the prior warning is irrelevant and plaintiff has no cause for complaint. But it is apparent that the requirement of "extraordinary conditions," rather than disadvantage to the United States, was the basis for the determination not to extend the contract. That was the principle reason given to plaintiff,[5] and internal correspondence of the Forest Service confirms that to be the fact. That correspondence also indicates that the Forest Service, in early 1969, was still acting on the belief, unfounded in fact, that plaintiff was "holding back" from cutting the timber pending the outcome of Tonga I. None of the Forest Service employees testifying at trial knew of any disadvantage to the United States by a further extension of the contract. Nor is there any doubt that the efforts made by plaintiff in 1968 to remove the timber, together with the conditions it encountered on Unit 15 in that year, would have been accepted, in prior years, as sufficient grounds for granting a further extension. The fact is that the Forest Service's decision rested squarely on its

determination that none of the excuses advanced by plaintiff amounted to "extraordinary conditions," a standard entirely different from that theretofore applied by the Forest Service, both under this contract and all other contracts.

 It is concluded that defendant had an obligation to administer this contract and to evaluate plaintiff's requested extension in conformity with its own regulations and its then-existing policy of granting extensions unless disadvantageous to the United States. Its unilateral imposition of an additional condition for obtaining an extension, having no apparent relation to its past administration of that policy, constituted a breach for which plaintiff is entitled to recover damages.

Turning to the matter of damages, plaintiff's claim is in two parts, the first seeking an award, in addition to that given in Tonga I, for loss of road amortization, and the second being based on the value of the timber it was denied from Unit 15.

 As to the matter of road amortization, it is clear from finding 37, in Tonga I, that the award for road amortization was based on the assumption that plaintiff would cut all of the remaining timber on Unit 15. Based on that assumption, the computation included the uncut timber as a part of the timber volume plaintiff would realize under the contract. By reason of defendant's breach, the volume plaintiff received was less than that. By utilizing the computations employed in Tonga I, it appears defendant's refusal to permit cutting of the remaining 3,000 MBF on Unit 15 resulted in plaintiff failing to recover $29,295.27 of its road-development costs. The refusal having been improper, plaintiff is entitled to recover that amount as one element of damage flowing from the breach.

---

**5.** The additional reason stated to plaintiff that the timber was needed to relieve an acute lumber shortage played no part in the decision. In fact, the Forest Service had no intention of putting the timber on Unit 15 on the market and it was only at the urging of the Department of Justice attorney that it ultimately did so. The timber sold for *less* than what defendant would have received under the contract with plaintiff.

As to the timber itself, and after several revisions in its approach, plaintiff ultimately tried the case on a theory of lost profits, contending that it is entitled to the profits it lost as measured by the difference between the contract price and the price it would have received upon resale of the timber in the export market. According to plaintiff's calculations, this amounted to $145,846.05.

■ The usual measure of damages for the failure to deliver goods is the difference between the contract price the buyer was to pay and the fair market value of those goods. Dulien Steel Products, Inc. v. United States, 143 Ct.Cl. 484 (1958); McCormick, Damages § 175 (1935); Uniform Commercial Code § 2–713. In making its calculations, plaintiff's experts took as fair market value the price the logs would have commanded in the export market in the latter part of 1969 and the first half of 1970 and, from this base, then calculated the profit plaintiff would have made at those prices.

■ ■ Reliance on the export log market is inappropriate as a measure of damages.[6] Use of the export log price has the effect of treating the contract as one for the purchase of goods for resale. In a purchase for resale, it is appropriate to measure the buyer's damage upon nondelivery as the difference between the contract price and the price at which the goods were to be resold. Benjamin v. United States, 348 F.2d 502, 520, 172 Ct.Cl. 118, 145 (1965); McCormick, Damages, *supra*. Had this been a purchase of timber for resale, the price plaintiff could have obtained in the export market would have been pertinent. However, this contract was not of that character. Plaintiff is a manufacturer of plywood, not an exporter of logs. Its timber purchases are for the purpose of supplying its plywood operations and it was for that purpose it entered the present contract. Nor is there a showing that an important part of its business consisted of selling logs to others at export prices. In that context, the foreseeable damages, Dale Construction Co. v. United States, 168 Ct.Cl. 692, 734 (1964), for which defendant is properly charged are the additional costs plaintiff incurred, or would have incurred, in procuring timber for its operations to replace the timber denied to it by defendant's breach.

■ Under the facts surrounding this contract, plaintiff's claim for lost profits based on resale of the timber in the export-log market must be viewed as consequential damages and can be recovered only if it is shown that defendant knew, or should have known, that plaintiff intended to resell a substantial number of the logs *and* that plaintiff sought to prevent its losses or mitigated its damages by procuring other timber. Uniform Commercial Code § 2–715. Neither condition has been satisfied in this case. As stated previously, plaintiff is a plywood manufacturer. There has been no showing that defendant had any reason to know that any substantial amount of the timber would have been used for any purpose other than in plaintiff's operations. Nor is there any evidence that plaintiff ever advised defendant that it intended to export the logs remaining on Unit 15, or to sell a substantial number of them. Also missing is any evidence that plaintiff made any effort to cover by procuring or diverting other logs to the export market or that, if it did so, it suffered any damage whatever. In particular, although plaintiff logged more timber in 1969 than it had in previous years, and apparently exported some, there is no evidence that any portion of that timber was logged as a substitute for the Tonga Ridge timber or, if so, that it cost plaintiff anything more than the Tonga Ridge timber would have cost. Under these circumstances, plaintiff's claim for consequential damages must be denied.

■ Consequential damages not being recoverable, there remains the ques-

---

**6.** Equally inappropriate as transactional evidence of fair market value is the Great Northern sale, which was an export log sale.

tion of whether plaintiff is entitled to any damages at all. Had plaintiff procured timber to replace the Tonga Ridge timber, it would have been entitled to recover the amount it had to pay in excess of the contract price. There is no evidence that this happened. In fact, it appears that plaintiff had a number of contracts with the Forest Service and had no difficulty in obtaining as much timber as its operations could handle. Nonetheless, to the extent the contract price was below fair market value, plaintiff is entitled to the benefit of its bargain as measured by that difference.

But therein lies the real difficulty. Plaintiff's evidence as to fair market value is based on the inappropriate resale price for export logs. This evidence is inappropriate because, as already suggested, there is insufficient showing that the plaintiff or any manufacturers of plywood would have resorted to the export market to buy logs for manufacturing purposes. The appraisals conducted by the Forest Service in redetermining the rates for Unit 15 and the subsequent resale of that timber by the Forest Service are the only other evidence bearing on this issue. That evidence is that the Forest Service appraised the timber on Unit 15 for 1969 at about $50 per MBF, established an advertised bid rate of $47.40 per MBF, unsuccessfully offered it at $34.50 per MBF and ultimately sold it at $23 per MBF. Under the contract, plaintiff was obliged to pay a minimum of $26.55 per MBF for approximately 1,300 MBF and a redetermined rate for the remainder. However, even the $26.55 was only a minimum figure, for the Service had the right to redetermine the rate upward any time it extended the contract. In fact, it never did raise the rate, and did not plan to do so in 1969, because of the road amortization. This is clear from its redetermination appraisal for 1969 where it allotted a figure of $46.29 for road amortization, thereby arriving at a redetermined rate

of $3.20 to be charged plaintiff. However, by the award in Tonga I and the additional award for road amortization it is entitled to receive in this case, plaintiff has been fully compensated for its road-development costs, so road amortization is no longer a factor to be included in determining the stumpage rate plaintiff was to pay under the contract. Thus, considering the road fully amortized, plaintiff is not entitled to the $3.20 rate as a contract price but rather the rate should be increased by $46.29.

What all of this adds up to is that, by reason of the redetermination provision, and assuming no factor for road amortization, plaintiff would have been obliged in 1969 to pay a contract price that was reasonably reflective of fair market value.[7] Stated otherwise, the evidence indicates that the price plaintiff would have had to pay, had it sought to procure comparable timber in the marketplace, would have been essentially the same as the redetermined value it was obligated to pay for the timber under the contract. If anything, the evidence suggests that plaintiff would have paid less in the marketplace. This is borne out by the redetermined value of approximately $50 established for 1969 as compared to the advertised bid rate of $47.40, the offer at $34.50, and the actual sale of that timber at $23.

Under these circumstances, it is concluded that plaintiff suffered no compensable damage by the denial of the timber and is entitled to no recovery on this phase of its claim. Gulf Chemical and Metallurgical Corp. v. Sylvan Chemical Corp., 122 N.J.Super. 499, 300 A.2d 878, aff'd, 126 N.J.Super. 261, 314 A.2d 73 (1973). In so concluding, it is recognized that this court has, where the proofs are uncertain but it is clear some damages were suffered, entered a judgment in the nature of a jury verdict. See e. g., Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 174 Ct.Cl. 153 (1966). That approach is

7. Although plaintiff argues that the Forest Service redetermination appraisals do not reflect fair market value, the court's findings 14 and 15 in Tonga I are to the contrary and are controlling here. In any event, there is no evidence from which it can be determined how much, if any, the appraisal is below fair market value.

deemed inappropriate here because it has not been satisfactorily shown that plaintiff suffered any damage not otherwise compensated for by the additional road-amortization award.

### III. Road Repair and Maintenance Claims [8]

The first of these claims occurred in early 1968, when the main Tonga Ridge road was washed out. (Findings 9–11.) The contracts for two of the three timber sales serviced by that road required defendant to bear all of the repair costs. The other contract, the one here in issue, placed the burden for road repairs on plaintiff. Defendant refused to share in any of the costs initially incurred by plaintiff in repairing the road and agreed to defray only 5% of those costs thereafter.

Defendant's argument that plaintiff repaired the road as a "volunteer" is utterly without merit. Plaintiff, before undertaking the work, asked defendant to share in the cost, and defendant promised to have a response in 10 days. Four months elapsed before defendant replied. In the meantime, plaintiff had to proceed with the repairs if it was to have any hope of completing operations on Unit 15 in the 1968 season. Having inexcusably delayed in responding to plaintiff's request, defendant is in no position to reap the benefits of plaintiff's labors on the basis they were volunteered.

Nor can defendant's contention that it was obligated only to pay 5% of the costs be accepted. That figure might have validity if the costs were for repairs occasioned by past use of the road, but that is not the case here. The repairs were needed to restore the road for future logging operations and as to those, 80.5% of the timber remaining to be transported over the road was from sales on which defendant was obliged to bear the repair costs. Applying that percentage, defendant should have borne $5,275.56 of the costs, and plaintiff is entitled to reimbursement in that amount.

The other road claim is as to maintenance work performed in 1969 by plaintiff under section 40(I) of the contract. That provision required plaintiff, at the conclusion of the contract, to perform final maintenance work on the roads. Consistent with its position that the contract was at an end, the Forest Service, on May 14, 1969, directed plaintiff to perform this work.

It is clear that, under the contract, plaintiff had the obligation to maintain the roads, both at the close of each season and at the termination of the contract. It is unclear from plaintiff's proofs precisely what work was done and for what purpose since some of the work was apparently performed prior to the directive by the Forest Service on May 14, 1969. In any event, there is no evidence that the maintenance work was anything other than what was required of plaintiff under the contract.

Since there is nothing in the contract to indicate that this obligation was dependent or contingent on plaintiff's cutting any specific volume of timber, the question is simply whether, by reason of defendant's breach, plaintiff was excused from performance of this obligation under the contract.

It is concluded that it was not. When, in 1969, defendant refused to grant a further extension, plaintiff had already cut and removed 43,000 M board feet of the total 46,000 M board feet available. Plainly, defendant's breach neither defeated the whole purpose of the contract nor deprived plaintiff of substantially all that it had bargained for. To the extent it was deprived of anything, plaintiff has, through recovery of the road amortization, been fully compensated for all the damages it has been able to prove. Giving consideration to all of the circumstances, Restatement, Contracts § 275 (1932), it is concluded that defendant's breach was not of such a character as to relieve plaintiff of its

---

**8.** Although not raised by the pleadings, defendant offered no specific objection and plaintiff was permitted to proceed at trial. (See Rule 39(b).)

obligation to perform road maintenance at the conclusion of the contract.

Accordingly, plaintiff is not entitled to recover the costs it incurred in meeting its obligations under the contract.

In summary, plaintiff is entitled to recover a total of $34,570.83.