**LOUISIANA PACIFIC CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 305–78.**

United States Claims Court.

Aug. 31, 1988.

Alan T. Saltman, Washington, D.C., for plaintiff.

Glen R. Goodsell, Washington, D.C., for defendant.

## OPINION

### MOODY R. TIDWELL, III, Judge:

This case involves a timber sale contract awarded by the United States acting through the United States Forest Service, Department of Agriculture. The trial concluded on October 4, 1984, and responsibility for the case was transferred to these chambers on March 30, 1988.

## FACTS

On January 6, 1970, the Forest Service awarded a contract to Northern Timber Company for the harvest of timber located within Deerlodge National Forest, Montana. The contract was designated the "West Fork" sale and was to be completed by October 1, 1974. The estimated harvest after clear-cutting was 14,800,000 board feet (14.8 MBF). On May 4, 1974, Northern Timber Company assigned the contract with defendant's approval to plaintiff. No terms or conditions of the original contract were changed by the act of assignment; plaintiff took over all rights, benefits and obligations that its predecessor in interest had under the original contract.

Plaintiff began its harvest of the West Fork sale during the 1974 operating season, the last year of the term of the original contract. On August 27, 1974, plaintiff formally requested a two-year extension of the contract from defendant in order to complete the harvest.[1] One month later defendant rejected plaintiff's request and stated that it would approve only a one-year extension with significantly modified terms and conditions. Plaintiff refused to accept the extension because of the costly modifications. The contract expired with the sale uncompleted under the terms of a short extension period on November 15, 1974. Thereafter, plaintiff filed suit, alleging in Count I that certain directives issued by the Forest Service constituted a breach or breaches of the contract. In Count II plaintiff alleged a breach of contract based upon defendant's unreasonable refusal to extend the period of performance under the same general terms and conditions as the original contract. At a subsequent post trial conference held on April 19, 1988, the parties requested that the court address only the issue of liability under Count II.

At trial plaintiff attempted to prove that under Forest Service policy it should have received its requested two-year extension of time to perform the contract with, at most, relatively insignificant changes to the contractual terms and conditions. Plaintiff claimed that defendant's response to its extension request would not lead to an extension of the original contract but was, rather, a transparent attempt by defendant to impose an entirely different contract upon plaintiff. Plaintiff based this assertion on three principal modifications identified by defendant in its one-year extension offer: (1) the elimination of eighty-eight percent of the remaining timber from the sale, (2) the requirement that plaintiff remove 1.9 MBF of pulpwood not required under the optional terms of the contract,[2]

---

1. Testimony established that most extensions granted were for one year, though some may have been for two years and others for thirty days or less. The time thought to be needed to complete the sale was a significant factor in determining the length of any extension.

2. It appears from the record that plaintiff had previously informed the Forest Service that it

and (3) the setting of new, more efficient, but costly, stream course protection requirements.

Defendant argued that its proposed changes as a condition of the extension were necessitated in great part by the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (1976), effective January 1, 1970, which required the Forest Service to become more sensitive to the environmental impacts of timber harvest contracts on Forest Service land. Defendant argued further that pre-NEPA Forest Service policy authorized the service to either reject, or agree to, significantly modified contract extensions to control environmental degradation. Defendant also argued that plaintiff had no "right" to an extension of its contract under its original terms and that extensions could not and would not be granted if the terms thereof would be "disadvantageous to the United States"; a factor to be considered in 1970 when Northern Timber entered into the original contract, at the time of assignment of the contract to plaintiff, and in 1974 when plaintiff requested the contract extension. Defendant introduced substantial testimony as well as documentary evidence to show that its decision to modify plaintiff's contract extension was necessary because of unacceptable damage to the environment caused by plaintiff's logging practices.

## DISCUSSION

This Opinion addresses the issue of whether defendant breached its contract with plaintiff by refusing to extend the time for performance for two years under similar or slightly modified terms and conditions as in the original contract.

Defendant correctly stated in its post-trial brief that "[t]he issue of what precisely constituted the Forest Services implied contractual commitment is a *legal* issue, not a question of fact." (Emphasis in original). In this instance, however, the legal issue turns, more so than usual, on the facts, *i.e.,* Forest Service policy and practice. The court finds it necessary to examine the fact intensive setting of this case to determine whether the Forest Service departed from its normal policy and practice when it refused plaintiff's extension request and, if so, whether that constituted a breach of contract.

The Forest Service, an agency of the United States Department of Agriculture, is authorized to regulate the national forests. *Wilson v. Block,* 708 F.2d 735, 741 (D.C.Cir.), *cert. denied,* 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983); *National Wildlife Fed'n v. United States Forest Serv.,* 592 F.Supp. 931, 938 (D.Or.1984); 16 U.S.C. §§ 472, 475, 528–531 (1982). The Multiple–Use Sustained Yield Act of 1960 directs the Forest Service to "develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products therefrom." 16 U.S.C. § 529 (1982). These products and services include outdoor recreation, range, timber, watershed, and wildlife. The definition of "multiple use" and "sustained yield" are set forth by statute:

(a) "Multiple use" means: The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

would in any event have to remove the pulpwood in order to continue its logging operations. Plaintiff's subsequent argument that this proposed new contract requirement constituted a major modification to the contract carried little weight in this decision.

(b) "Sustained yield of the several products and services" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land.

16 U.S.C. § 531 (1982).

Forest Service policy may be derived from the United States Code, by regulation, from the Forest Service Handbook or in express or implied contract terms. *Everett Plywood Corp. v. United States*, 206 Ct.Cl. 244, 256, 512 F.2d 1082, 1089 (1975); *Wysinger v. United States*, 621 F.Supp. 773, 775 (D.La.1985), *aff'd*, 784 F.2d 1252 (5th Cir.1986). Contractual duties may also be determined by established practice or custom. *Everett Plywood*, 206 Ct.Cl. at 256, 512 F.2d at 1089 (citing *Stoekert v. United States*, 183 Ct.Cl. 152, 165, 391 F.2d 639, 647 (1968)). Where well-established custom exists, it is assumed that the parties to the contract intended that practice to apply. *Id.* As the court in *Cape Fox Corp. v. United States*, 4 Cl.Ct. 223, 235 (1983), noted, "Forest Service policy applicable to an extension of a timber sale contract in existence at the time the contract was executed, is a part of the contract."

■ The Forest Service has wide discretion in policy determinations involving the proper uses of any lands or resources within National Forests. *Sierra Club v. Hardin*, 325 F.Supp. 99, 123 (D. Alaska 1971). This discretion, however, is not absolute. The power to extend plaintiff's contract was within the discretion of the Forest Service, and as such the principal issue to be decided is whether defendant acted fairly and reasonably, and not arbitrarily and capriciously, when it refused to grant plaintiff's extension request. *Everett Plywood*, 206 Ct.Cl. at 256–57, 512 F.2d at 1090.

■ Plaintiff's argument of breach of contract under Count II of the complaint was based upon an alleged, long-standing, nationwide Forest Service policy of regularly granting timber sale contract extensions without requiring the purchaser to agree to extensive modifications or undertake significant new obligations. That policy was not expressly stated in the contract, but was arguably derived from custom and two sections of the Forest Service Manual; sections 2433.11 and 2433.12, both of which were in effect on the date of execution of the contract with Northern Timber Company.

FSM § 2433.12 (1970) stated: "Ordinarily, the timber sale contract is written on the basis that time is not of the essence." That section noted further, "an extension of time may be granted ... unless [it would be] disadvantageous to the United States." Section 2433.11 permitted the Forest Service to modify extended contracts as "necessary to bring the contract [terms and conditions] up to date with other comparable contracts being issued at the time of the extension." FSM § 2433.11 (1970). Section 2433.11 also specified that to qualify for an extension the contractor must have harvested at least fifty percent of the timber and constructed necessary roads to reach at least sixty percent of the remaining timber. It is clear from the record that plaintiff and its predecessor in interest, Northern Timber Company, had not cut fifty percent of the timber nor had plaintiff constructed roads to reach sixty percent of the remaining timber. At trial, however, there emerged a consensus that the cutting and road construction percentage requirements were often ignored by the Forest Service in reaching its decision whether or not to grant a requested extension of time for contract completion.[3] The court, therefore, does not consider plaintiffs failure to cut timber or construct roads as dispositive of the issue in dispute.

On June 30, 1971, the Forest Service issued a new contract timber sale extension policy statement which applied to all contracts awarded after that date. The new policy continued much of the pertinent elements of the old policy but provided that contracts would not be extended unless they could be clearly brought into compli-

---

**3.** The United States Claims Court in *Cape Fox Corp. v. United States*, 4 Cl.Ct. 223, 235 (1983), found the harvesting percentage requirement not to be an absolute requirement.

ance with the then new environmental standards. As pointedly argued by plaintiff, the new policy did not apply to it because it expressly exempted first logging contract extension requests made after July 1, 1971 if the contract had been awarded before that date. The old policy, however, never stated that timber sale contract extensions were automatic, though palpable evidence indicated that the Forest Service in the late 1960's and 1970 was afraid that it might have inadvertently established an automatic extension policy by routinely extending some sales that should not have been extended. The new policy was promulgated to negate that concern.

Both parties cite *Everett Plywood Corp. v. United States,* 206 Ct.Cl. 244, 512 F.2d 1082 (1975), in support of their respective positions. *Everett Plywood* involved a government logging contract to which the Forest Service refused to grant an extension after having granted eight successive extensions of the same contract. The court held that defendant's refusal constituted a breach of contract and awarded damages to plaintiff because the Forest Service applied the wrong standard in determining whether the extension should have been granted. *Id.* at 260, 512 F.2d at 1092. The *Everett Plywood* court described the Forest Service extension policy as very liberal. *Id.* at 255, 512 F.2d at 1089. It found that:

> Extensions were regularly granted for a variety of reasons ranging from bad weather to poor economic conditions. Forest Service personnel testifying at trial could recall no specific instance where, prior to 1969 an extension had been denied.... The fact is that Forest Service extensions of contracts were granted by

the Forest Service with very little urging.

*Id.* at 250, 512 F.2d at 1086.[4] Plaintiff argued that the automatic contractual extension proposition stated in *Everett Plywood* was reaffirmed in *Cape Fox Corp. v. United States,* 4 Cl.Ct. 223 (1983). In *Cape Fox,* the court found that:

> Forest Service policy applicable to an extension of a timber sale contract in existence at the time the contract was issued, is a part of the contract. The Forest Service is liable for breach of the contract commitment if it erroneously refuses to extend a timber sale eligible for extension.

*Id.* at 235.

*Everett Plywood,* as interpreted by plaintiff, is inapplicable to the issues now before the court. In that case the Forest Service was found to have acted in an arbitrary and capricious manner because it failed to evaluate the extension request in accordance with the policy, practice and custom in effect at the time the contract was executed. That court found that defendant improperly used a more onerous "extraordinary conditions" standard instead of the "disadvantageous to the United States" standard and that the imposition of the "extraordinary conditions" standard constituted a breach of contract. *Everett Plywood,* 206 Ct.Cl. at 257–58, 512 F.2d at 1090. This court reads *Everett Plywood* to stand for the proposition that the Forest Service had the discretionary authority to refuse to extend any contract that would be disadvantageous to the United States. *Everett Plywood,* 206 Ct.Cl. at 256, 512 F.2d at 1089.[5] The exercise of that discre-

---

**4.** Even though this court did not have the briefs or transcript on *Everett Plywood,* it is obvious from a review of the opinion that the United States Court of Claims did not have the benefit of testimony as did this court that significantly modified terms, including those addressing environmental matters, had been added to prior logging contract extensions as the price for the extension.

**5.** At the status conference of April 19, 1988, plaintiff asserted that law of the case had been established during a status conference held February 29, 1988, during a discussion of whether the "disadvantageous to the United States" stan-

dard referred singularly to financial disadvantage only or to environmental disadvantage as well. Plaintiff errs in this conclusion. Law of the case pertains only to issues that have been fully decided. *Gindes v. United States,* 740 F.2d 947, 949 (Fed.Cir.), *cert. denied,* 469 U.S. 1074, 105 S.Ct. 569, 83 L.Ed.2d 509 (1984) (citing *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912)). The issue of what constitutes disadvantageous to the United States was not conclusively decided at the February 29, 1988 conference. In any event it cannot be said that plaintiff has been prejudiced in any manner.

tion had to be fair and reasonable, not arbitrary and capricious. *Id.* Forest Service policy, old and new, allowed an extension without significant changes from the terms of the original contract if the Service determined that the United States would not be disadvantaged, environmentally or otherwise. The converse is just as true.

The court, after a thorough review of the trial record, is not convinced that it was Forest Service policy to automatically grant timber contract extensions without regard to the manner in which the contractor performed under its original contract. The court gave great weight to the testimony of Mr. Magnus E. Chelstad, an experienced and knowledgeable official of the Forest Service, that the Forest Service could not extend a sale through extensions that in its judgment would have caused or furthered unacceptable environmental damage. The Forest Service's basic charge is to protect the multiple use resources of natural forest lands taking into consideration, among other factors, recreation, water, fish and fish habitat, watershed, wildlife and wildlife habitat, minerals and soil, including soil stability, as well as obtaining fair market value for timber harvests. 16 U.S.C. §§ 529–30 (1982). Extending a contract that would permit or perpetuate the destruction of any of these resources would violate that basic charge.

In the case at bar the Forest Service exercised its discretion by determining that an extension of plaintiff's contract under the same or similar terms as the original contract would be "disadvantageous to the United States" because of harm to the environment and, thus, would accept only a significantly modified extension responsive to its concerns. The court finds that the Forest Service was reasonable and fair in making that determination. The modifications involved measures to protect wildlife and unstable soils, and required a change in plaintiff's logging procedures; actions that were intended to protect National Forest land from further environmental degradation.

Defendant's actions in this case were not without precedent. Logging contract ex-

tensions had been significantly modified in the past by the Forest Service to protect the environment and the forest resources. *See Minnesota Pub. Interest Research Group v. Butz,* 498 F.2d 1314, 1318 (D.Minn.1974); *Cape Fox,* 4 Cl.Ct. at 228. Under the policies in effect at the time of the award of the original contract to Northern Timber Company the Forest Service was obligated to impose environmental modifications on its logging contractors if the need existed. *Id.* at 228, 229. Most significantly, in *Cape Fox Corp. v. United States,* 4 Cl.Ct. 223 (1983), an example of the operation of the Forest Service's pre–1971 policy, plaintiff accepted substantial environmentally-oriented modifications to the terms of its original 1969 contract in consideration for a first extension given in 1974. Those modifications, in part, included measures to protect wildlife and unstable soils and a change in plaintiff's logging procedures. *Id.* Additional evidence introduced at trial established that extensions for pre-July 1971 contracts clearly were not automatic. Logging contracts had been modified and granted at the time of extensions, or rejected, based on environmental concerns. Such instances included: the Mullen Creek sale on the Medicine Bow National Forest in 1971, where a substantial reduction in sale volume and changes in yarding methods and cutting size were required; the Medicine Lake Bench sale in the Deerlodge Forest in 1971, where an extension was executed with modifications including changes in cutting unit size, rate determinations, and the addition of specific harvesting method clauses; and the Comptroller General's decision in the Bunker Creek sale which supported the modification of contract extensions for environmental reasons. *Bunker Creek Sale,* B–173551 Comp.Gen.Dec. (1971). Other instances included the Roaring Fork timber sale in 1972 where an extension was executed with environmental modifications including changes in the size of cutting units, road locations, cutting and cleanup methods; the Sand Basin II sale in the Deerlodge Forest in 1972, where an extension was executed with environmental changes such as a deletion of cutting units, changes in the contract rate, and an addition of specific harvesting method clauses; and

the Mosca Creek sale in the San Juan National Forest in 1973, in which an extension was executed with environmental modifications in the logging method and road system, and substantial reductions in sale volume. The court is satisfied that this evidence established that logging contract extensions were not automatically granted, and were most certainly not granted without consideration of environmental factors.

Additionally, FSM § 2433.11 (1970) specifically provided for modifications as preconditions to extensions "which are necessary to bring the contract up to date with other comparable contracts being issued at the time of the extension." This was supported by the testimony of a Forest Service timber management officer in which he stated that if a pre–1971 sale was designed

> under a concept that did not meet today's standards, that had developed through land management, planning or discovery of new items during the timber sale such as essential wildlife habitat, unstable soils, and the contract could not be modified to recognize and correct those values, then it would be to the disadvantage of the government and the sale would be allowed to terminate.

This court finds that the identified modifications were within the Forest Service's discretion under both the old and new policies, and that defendant did not act arbitrarily, capriciously, unfairly or unreasonably in refusing to allow plaintiff's requested extension. The court's conclusion is not only supported by defendant's past policies and practice, but also by defendant's duty to comply with NEPA and other relevant environmental and natural resource laws.[6]

*Minnesota Pub. Interest Research Group v. Butz*, 498 F.2d 1314 (D.Minn. 1974), was illustrative of the weight given

environmental concerns by the Forest Service in granting contract extensions. In *Minnesota,* plaintiff, an "environmental" organization, sought temporary and permanent injunctions against logging operations in the Boundary Waters Canoe Area of Minnesota. The logging contracts involved eleven pre-NEPA Forest Service timber sales. On six of the sales the Forest Service granted extensions after January 1, 1970. The court stated, "there was no obligation on the part of the Forest Service to grant these extensions," though it was routine practice to do so. *Id.* at 1318. The court noted further that, "[m]odifications ... were negotiated by the Forest Service in seven of the sales contracts and were made for environmental reasons." *Id.*

Defendant in this case similarly considered the adverse environmental impacts of granting plaintiff's extension request, and as a result determined that it would grant an extension only if plaintiff would accept the modified contractual terms. This court finds that defendant had an unquestionable mandate to evaluate the environmental effect of plaintiff's logging practices when making the decision whether or not to extend and/or modify the contract. Defendant's identified modifications, albeit major, to plaintiff's contract were consistent with that mandate. As such, defendant acted properly when it informed plaintiff it would extend the contract for one year with the modifications.

### CONCLUSION

The court finds, from a review of the entire voluminous record, that defendant's identified modifications to plaintiff's contract were prepared in response to a heightened sensitivity to environmental considerations, and to plaintiff's poor log-

---

**6.** The court also notes that NEPA standards are applicable to pre-NEPA contracts. *Minnesota Pub. Interest Research Group v. Butz,* 498 F.2d 1314, 1320 (D.Minn.1974). NEPA requires a Federal Agency to. compile an environmental impact statement whenever a contract is considered to be a major federal action which may have a significant affect on the environment. *Id.* at 1319; C.E.Q. Guidelines, 36 Fed.Reg. 7724 (1971). Environmental factors are to be considered to the fullest extent possible. *Minnesota,* 489 F.2d at 1320; 42 U.S.C. § 4321 (1982).

The Council on Environmental Quality stated that:

> [a]gencies have an obligation to reassess ongoing projects and programs in order to avoid or minimize adverse environmental effects.... While the status of the work and the degree of completion may be considered in determining whether to proceed with the project, it is essential that the environmental impacts of proceeding are reassessed pursuant to the Act's policies and procedures....

40 C.F.R. § 1500.13 (1974).

ging practices which caused extensive environmental damage both within and without the contract area. Defendant's position was neither arbitrary nor capricious and was properly predicated upon law and policy in existence at the time the original contract was awarded to Northern Timber, the assignment of that contract to plaintiff, and the requested extension. Defendant did not depart from its normal policy and practice when it refused plaintiff's extension request notwithstanding the 1971 Forest Manual policy change. Defendant had the authority under the pre–1971 policy to evaluate and address plaintiff's logging practices vis-a-vis its environmental impact on Deerlodge National Forest and had exercised that authority to such an extent in other instances that this court cannot conclude that plaintiff had relinquished it by operation of law or as a matter of policy. The 1971 policy change did not preclude defendant from exercising its rights and duties to protect natural resources in contracts awarded prior to that date. Based on the foregoing, the court concludes that defendant did not breach plaintiff's contract by refusing to grant the extension as sought by plaintiff. Axiomatically, plaintiff is not entitled to damages on its claim under Count II for breach of contract. Count II of the complaint is dismissed. The Clerk is directed to act accordingly. No costs.

