**SILLER BROTHERS, INCORPORATED**

v.

**The UNITED STATES.**

No. 185–79C.

United States Court of Claims.

June 17, 1981.

Alan I. Saltman, Washington, D. C., attorney of record, for plaintiff. Saltman & Stevens, P. C., Washington, D. C., Lyle D. Gisi, Offutt, Coolidge & Gisi, Yuba City, Cal., and Joseph J. Petrillo, Washington, D. C., of counsel.

Marsha D. Peterson, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and BENNETT and SMITH, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

The principal issue in this case, which is before us on cross-motions for summary judgment, is whether the government validly barred the plaintiff from rebidding on a contract to cut timber in a national forest, because of the plaintiff's failure to cut any timber during the 3-year term of the prior contract that had been awarded to the plaintiff. The plaintiff also contends that the government did not adequately attempt to mitigate damages and that it improperly calculated damages on the resale. We hold for the defendant on all issues.

### I.

In 1974, the Forest Supervisor of the Bighorn National Forest in Wyoming invited bids for the sale of standing timber there. The contract was to cover the cutting and sale of 3,390 MBF (thousand board feet) of timber, and the invitation specified a minimum bid of $56.66 per MBF. The successful bidder also would be required to build about 8.96 miles of road. The plaintiff and Wyoming Sawmills, Inc., were the only bidders. An oral auction was then held, at which the plaintiff was awarded the contract on its bid of $100 per MBF.

The contract, awarded in August 1974, was for a 3-year term ending September 30, 1977. At the end of the term the plaintiff had not felled a single tree. It had constructed 5.86 miles of road for which it earned a "purchaser credit" of $92,869.80 which, under the contract, was to be applied to reduce the plaintiff's payment for the timber it cut. The plaintiff also had paid a deposit of $6,233 when it received the contract.

Following the termination of the contract, the Forest Supervisor, in October 1977, notified plaintiff that the government would assess damages against it, that the timber would be readvertised for sale, and that, pursuant to a cited regulation, the plaintiff would not be permitted to bid for the reoffered timber.

The government circulated the announcement of the reopening of the timber to a bidder list which included 19 persons. The announcement showed that the plaintiff had been removed from the eligible list. The minimum bid price was $80.37 per MBF, which was $23.71 more than the minimum bid for the earlier sale.

Plaintiff twice requested the Forest Supervisor to permit it to bid. In its final request, made the Friday before the Monday bid opening, the plaintiff stated that the regulation the Forest Service had relied upon had been changed. The Forest Supervisor reviewed the new regulation, and again denied plaintiff the opportunity to bid.

When the bids were opened in January 1978, only Wyoming Sawmills submitted a bid. It bid $80.42, or 5 cents above the minimum. Since there was only one bid, no auction was held, and the contract was awarded to Wyoming Sawmills at that price.

In the present suit the plaintiff seeks $99,102.80, reflecting its purchaser credit of $92,869.80 for the construction of the roads and the $6,233 deposit it made when it received the original contract in 1974. The government has filed a counterclaim for $45,772.15, covering its damages for the plaintiff's failure to perform the contract (*see infra*, pp. 1045–1046).

### II.

In seeking recovery of its purchaser credit and deposit, the plaintiff contends that in barring it from rebidding, the Forest Supervisor violated both the regulations of the Forest Service and the Small Business Act, and that the government therefore improperly retained those amounts to use as an offset against the loss it suffered on the relet contract (*see infra*, p. 1044).

A. The regulation upon which the plaintiff relies states:

Except as otherwise provided in this section, no bid will be considered in the

resale of timber remaining from any uncompleted timber sale contract from any person, or from an affiliate of such person, who failed to complete the original contract (i) because of termination for purchaser's branch [sic] or (ii) through failure to cut designated timber or portions of the sale area by the termination date, *unless acceptance of such bid is determined to be in the public interest.* 36 C.F.R. § 223.5(h)(1) (emphasis added) (italicized portion added effective June 2, 1977).

The plaintiff first points out that when the Forest Supervisor informed it in 1977 that it would not be allowed to bid on the reletting of the contract, he referred to an earlier version of the regulation that did not contain the italicized language above. In its second request to rebid, however, the plaintiff referred to the changed regulation, and the Forest Supervisor reviewed the current version when he continued to refuse to allow the plaintiff to rebid. The Forest Supervisor thus considered the plaintiff's request under the revised regulation.

The plaintiff's major argument is that under the regulation the Forest Service was required to, but did not determine whether acceptance of the plaintiff's bid would be in the public interest and that without such determination the Forest Supervisor's refusal to allow the plaintiff to bid was improper. We do not interpret the regulation to require a formal public interest determination. The regulation bars a defaulting contractor from rebidding at a resale under a timber contract, but authorizes the Forest Service to allow it to rebid if the Service determines that awarding it the contract would be in the public interest. The refusal of the Forest Supervisor to permit the plaintiff to rebid was an implicit determination that awarding the plaintiff the contract would not be in the public interest. The regulation required no more.

*Everett Plywood Corp. v. United States,* 206 Ct.Cl. 244, 512 F.2d 1082 (1975), upon which the plaintiff relies, is inapplicable. That case involved the Forest Service's refusal to extend the term of a timber-cutting contract. The Forest Service had a regulation under which it routinely granted extensions of timber-cutting contracts upon request unless the extension would be "disadvantageous to the United States." We held that the Forest Service had violated that provision since it denied the extension not because it concluded that the extension would be disadvantageous to the United States, but under a "standard entirely different from that theretofore applied by the Forest Service" (namely, whether the reasons the plaintiff gave for an extension "amounted to extraordinary conditions"). 206 Ct.Cl. at 257, 512 F.2d at 1090. In other words, we held that the Forest Service had deviated from its own regulation.

In the present case, in contrast, we construe the rebidding regulation as barring a defaulting contractor from rebidding unless the Forest Service determines that awarding it the contract would be in the public interest. Here, unlike *Everett Plywood*, there is no indication that the Forest Service did not act in conformity with the regulations. Indeed, since the plaintiff had not cut a single foot of timber during the 3-year term of the contract, the Forest Service had no reason to think that the plaintiff would behave any better if it were awarded a second contract to cut the same timber. In these circumstances, the Forest Service was fully warranted in not determining that allowing the plaintiff to bid on the second contract would be in the public interest.

B. The provision of the Small Business Act, upon which the plaintiff relies, states as follows:

(b) It shall also be the duty of the [Small Business] Administration and it is empowered whenever it determines such action is necessary—

. . . . .

(7)(A) To certify to Government procurement officers, and officers engaged in the sale and disposal of Federal property, with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integ-

rity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract. A Government procurement officer or an officer engaged in the sale and disposal of Federal property may not, for any reason specified in the preceding sentence, preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a final disposition to the Administrator. 15 U.S.C. § 637(b)(7)(A) (Supp.I 1977).

The plaintiff contends that the Forest Supervisor's decision to bar it from bidding on the second contract was a determination that the plaintiff was not a responsible bidder, and that under section 637(b)(7)(A) the Small Business Administrator had exclusive authority to make all determinations concerning the "responsibility" of bidders who are small business men. The plaintiff had filed an affidavit, which the government had not controverted, that it is a small business concern under the Act.

Although the language of the second sentence of the section is broad enough to cover the Forest Supervisor's barring of the plaintiff from bidding on the second contract, the legislative history of the provision indicates that it was not intended to apply in this situation.

Section 637(b)(7)(A) had its genesis in the Defense Production Act Amendments of 1951, Pub.L.No.96 § 714(e)(6) [§ 110(a)], 65 Stat. 131 (1951). Those amendments created the Small Defense Plants Administration and authorized it to certify the capacity and credit of small businesses. The House Report accompanying the 1951 amendments explained the reasons for this action:

(a) **Small business has been unable to obtain a fair share of defense contracts.** —This is a problem of business life or death to thousands of small manufacturing concerns which have been unable to obtain materials to continue in civilian production. Of course, the path of least resistance is that of loading defense contracts on to large corporations and allowing small business to fall by the wayside. This is the path which was followed in the early years of World War II, when 100 large corporations received 67 percent of prime contracts. During this same period, one-sixth of the small businesses in the Nation closed their doors.

This mistake must not be repeated. Our mobilization program must extend down into the small plants, since they are a major source of our productive strength. The proposed amendment [subsequently enacted] would accomplish this by creating a Small Defense Plants Corporation with authority to certify qualified small businesses for prime contracts. Procurement officers would be directed to accept this authorization as conclusive. This provision would give small businesses definite assurance of a fair share of prime contracts.

H.R.Rep.No.639, 82d Cong., 1st Sess. 31, *reprinted in* [1951] U.S.Code Cong. & Ad. News 1626, 1645–46.

The Small Business Act of 1958, Pub.L. No.85–536 § 8(b)(7), 72 Stat. 384 (1958), expanded this provision to cover all government procurement and sales, not just defense contracts. The provision took the form of the present section 637(b)(7)(A) except that the reference to the administrator and the administrator's certifying authority were limited to questions "with respect to the competency, as to capacity and credit, of any small-business concern or group."

The Small Business Act was amended in 1977 to broaden to its present form the concept of "responsibility" for which the administrator was to certify small businesses. The House Report on the amendment explains the congressional concern:

Small business can and has been denied Government contracts because the procuring activity has determined that the small business lacked the requisite "tenacity, perseverance or integrity" to perform a specific Government contract. Such a finding results in the small firm being branded "nonresponsible." Resort to the ["Certificate of Competency"] procedure in such cases is not available since capacity and credit are, purportedly, not involved.

H.R.Rep.No.95–1, 95th Cong., 1st Sess. 13, reprinted in [1977] U.S.Code Cong. & Ad. News 821, 833. See also S.Rep.No.95–184, 95th Cong., 1st Sess. 7–8 (1977).

■ Although the 1977 amendments were intended to give the administrator broader authority to determine whether small businesses seeking to participate in government contracts are responsible, we conclude that the provision does not apply to the Forest Service's refusal to permit the plaintiff to bid on the second timber contract. The purpose of this provision, as reflected in the legislative history of its predecessors, was to end the discrimination against small business that existed because contracting officers had barred those businesses solely because of their smallness and disabilities allegedly resulting from that fact. There is no indication, however, that Congress also intended to cover the situation of the reletting of the contract after a small business firm had defaulted in performance.

■. The Forest Service regulation does not discriminate against small businesses but generally bars all defaulting contractors from bidding upon the reletting of the contract. The Forest Supervisor refused to allow the plaintiff to participate in rebidding, not because of alleged deficiencies stemming from its size, but because of its failure to cut any timber under the prior contract. The result would have been the same if the plaintiff had not been a small business. In the special circumstances of this case—where the plaintiff had not cut a single foot of timber under the contract for 3 years—section 637(b)(7)(A) of the Small Business Act did not require the Forest Supervisor to refer the matter to the administrator before he could bar the plaintiff from participating in the rebidding of the contract.

### III.

The plaintiff opposes the government's counterclaim covering the losses the government suffered when it relet the contract for a lower amount than the contract with the plaintiff would have produced on the ground that the government failed adequately to mitigate its damages. The argument has two branches: (A) By excluding the plaintiff from rebidding, the government lost the higher price it would have obtained at a second auction; (B) because the second contract was a "sole source" situation, the government should have attempted to negotiate a higher price with Wyoming Sawmills than the minimum price the latter bid.

■ A. 1. Our conclusion in part II that the government justifiably excluded the plaintiff from rebidding also refutes the plaintiff's argument that the exclusion constituted a failure to mitigate damages. It would be anomalous to hold that the government properly barred the plaintiff from rebidding but that by taking such action the government violated its obligation to mitigate damages. Indeed, it would have been improper for the government to have permitted the plaintiff to bid on the relet contract where the government would not have awarded the contract to the plaintiff if the latter had been the high bidder. Permitting the plaintiff to bid in that circumstance would have been grossly unfair to Wyoming Sawmills, which would have had to pay a higher price as a consequence of an artificial and misleading auction procedure. Having been disqualified by totally breaching the first contract, the plaintiff now cannot properly complain because its exclusion from bidding on the second contract may have increased the damages it must pay for its breach of the earlier one.

■ 2. We recently recognized that the government's duty to mitigate damages does not necessarily require, although it may authorize, the government to permit a defaulted contractor to bid on the reprocurement (and, by the same reasoning on the reletting of a sales contract). In Venice Maid Company, Inc. v. United States, 225 Ct.Cl. ——, ——, 639 F.2d 690, 697 (1980), in ruling that the government had not failed to mitigate damages by not awarding a contract to the defaulting contractor on the reprocurement, we stated that a defaulting

contractor "*may* be considered for award of the reprocurement contract" (emphasis in original). *See also Churchill Chemical Corp. v. United States,* 221 Ct.Cl. ——, ——, 602 F.2d 358, 363 (1979). The Armed Services Board of Contract Appeals similarly has stated that

> [i]n some circumstances the reasons for the default may be such as not to indicate an inability on the part of the defaulted contractor to perform the reprocurement contract, in which event there may be an implied duty on the part of the Government to permit the defaulted contractor to bid on the reprocurement so as to permit him to mitigate his damages.

*Woodrow P. Hudson d/b/a San Diego Concrete Disposal,* ASBCA No. 21,044, 76–2 BCA (CCH) ¶ 12,182 (1976). *See also Venice Maid Company, Inc.,* ASBCA Nos. 20,-546, 20,792, 76–2 BCA (CCH) ¶ 12,045 (1976).

■ The Comptroller General has ruled that "once the contracting officer decides that it is appropriate to conduct a new competition for reprocurement, he may not automatically exclude the defaulted contractor from that competition." *PRB Uniforms, Inc.,* 56 Comp.Gen. 976, 978 (1977). *See also Ikard Manufacturing Co.,* 58 Comp. Gen. 54, 57 (1978). Since the Forest Service's regulation permits a defaulting contractor to rebid if the Service determines that acceptance of his bid would be in the public interest, the Comptroller General might uphold the exclusion of the plaintiff from rebidding in this case. *But cf.* Unpublished Comptroller General Decision No. B–195497 (June 2, 1980), which recommends that the Forest Service "consider revising [this] regulation" because the Comptroller General "do[es] not believe automatic disqualification of a defaulted timber purchaser insures open and fair competition." In any event, we conclude that in refusing to permit the plaintiff to participate in the rebidding, the government did not violate its obligation to mitigate damages.

B. The plaintiff contends that when, upon opening of the bids at the reletting, the Forest Supervisor discovered that only Wyoming Sawmills had bid, he should have attempted to negotiate a higher price with the bidder instead of accepting the bid and that his non-negotiation constituted a failure to mitigate damages. It urges that the Forest Service should have treated the case as a "sole source" situation, in which the government is not required to accept whatever offer the prospective contractor makes.

■ The sole source concept, however, relates mainly to procurement, not to sales. *See, e. g.,* 10 U.S.C. § 2304 (1976); 41 U.S.C. § 252(c) (1976). *See generally* 1B J. McBride & T. Touney, Government Contracts, ch. 9 (1981). It involves a situation where the government does not seek bids or invitations from more than one source, but instead decides to negotiate with only one person. Furthermore, a negotiated contract must be authorized by statute. *New York Mail and Newspaper Transportation Co. v. United States,* 139 Ct.Cl. 751, 757, 154 F.Supp. 271, 275, *cert. denied,* 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957). Even assuming that the same principle would apply to sales of government property and that a statute permits sale by negotiation, under the facts here this was not a sole source arrangement.

■ The Forest Service sent invitations to bid on the reletting of the contract to 19 concerns, 11 of which were located in Wyoming. It also advertised the sale in a local newspaper, The Sheridan (Wyoming) Press. The fact that only a single bid was submitted did not convert this advertised and solicited bidding procedure into a sole source arrangement.

■ Wyoming Sawmills' bid slightly exceeded the minimum bid the government specified in the advertisement. Implicit in setting a minimum bid is the understanding that the government is willing to and will make the sale at that price. The plaintiff points out that the selling price under the second contract dropped from $100 MBF in the first contract to $80.42 MBF, "in spite of an apparent rise in the market price of timber sold." What the plaintiff overlooks, however, is that the minimum bid of $80.37 for the second contract was $23.71 higher

than the minimum bid of $56.66 for the same timber under the first contract. This significantly higher minimum bid price under the second contract presumably reflected the increase in timber prices since the first contract was let and the higher price for the first contract that the auction had produced.

 The regulations governing the sale of standing timber do not provide for negotiation but only for advertising and bidding. 36 C.F.R. § 223.5(a). The Forest Supervisor did not act improperly or fail to mitigate damages in accepting the only bid he received at a price that exceeded the minimum.

### IV.

The damages of $45,772.15 that the government assessed against the plaintiff—the subject of the counterclaim—were computed as follows:

| | |
|---|---:|
| The amount the government would have received if the plaintiff had performed the contract, based on the contract price of the timber at the time of termination (September 30, 1977) of $122.26 per MBF. This price represented the initial contract price of $100 with quarterly adjustments pursuant to the contract to reflect changes in a timber price index: | $414,461.40 |
| Plus Cost of Resale: | 3,037.35 |
| Total | 417,498.75 |
| Less Purchaser Credit (earned from building the road): | 92,869.80 |
| | 324,628.95 |
| Less the amount bid by Wyoming Sawmills at the resale ($80.42 per MBF): | 272,623.80 |
| Total damages | 52,005.15 |
| Less Deposit on Sale held by the Forest Service: | 6,233.00 |
| Total Damages | $45,772.15 |

The plaintiff contends that in calculating damages the government should have escalated not only the $100 contract price, but also the $80.42 price under the rebid contract, to reflect the amounts Wyoming Sawmills actually paid.

The contract specifies the measure of damages if the contractor defaults and the timber is resold.

Paragraph B9.4 states:

Damages due the United States for Purchaser's failure to cut and remove such timber meeting Utilization Standards shall be the amount by which Current Contract Value plus the cost of resale, less any effective Purchaser Credit remaining at the time of termination, exceeds the resale value at new Bid Rates.

The "Current Contract Value" is defined as the "sum of the products of Current Contract Rates and estimated remaining ... [t]imber." Paragraph B3.1. "Current Contract Rates" are the "Tentative Rates," which consist of the minimum bid prices (the "Advertised Rates") plus the amount by which the contract price exceeds the minimum ("Bid Premium Rates"), to which is added any quarterly price escalation. Paragraphs A5, B3.1. Since no timber was cut in the present case, the "Current Contract Value" is the same as the "Current Contract Rates" multiplied by the amount of timber to be cut under the contract. The "Current Contract Value" when the contract was terminated on September 30, 1977, was $414,461.40, based upon the then "Current Contract Rate" of $122.26 per MBF multiplied by the 3,390 MBF of timber to be cut.

The issue in dispute is the meaning of the words "the resale value at new Bid Rates" in paragraph B9.4, which is to be subtracted from the "Current Contract Value" in determining damages. "Bid Rates" are defined as "the rates bid by Purchaser ... and are the sum of Advertised Rates and Bid Premium Rates. Until a rate redetermination becomes effective, the Bid Rate [here applicable] ... is the Tentative Rate which is subject to quarterly adjustment...." Paragraph A5.

As indicated, the "Advertised Rate" is the minimum bid and the "Bid Premium Rate" is the difference between that minimum rate and the price at which the contract was let. The "new Bid Rate" for the resale of the timber to Wyoming Sawmills was the minimum price of $80.37 specified in the invitation plus the 5 cents additional that Wyoming Sawmills bid. The government determined that the "resale value at new Bid Rates" was $272,638.80 ($80.42 × 3,390), which was the amount the government subtracted from the Current Contract Value of $414,461.40.

When the contract speaks of the resale value at "new Bid Rates," we think it refers to the specific price at which the new contract was let and not to any escalation of that price during the period of performance. The "Bid Rates" are defined as the "rates bid by Purchaser." The rate Wyoming Sawmills bid was $80.42, not the amounts by which this bid subsequently was escalated. Although that rate was subject to quarterly adjustment, there is no indication in the contract that if the contractor defaulted and the government resold the timber, the government's damages were to be calculated upon the escalated rate rather than upon the rate the new contractor bid. When the contract refers to escalated rates, it uses the term "Current Contract Rate," not "Bid Rates." We therefore conclude that the government correctly calculated the damages.

## CONCLUSION

The plaintiff's motion for summary judgment is denied, and the defendant's motion for summary judgment is granted. The petition is dismissed. The defendant is entitled to recovery of $45,772.15 on its counterclaim, and judgment in that amount is entered for it against the plaintiff.