FOREST ENVIRONMENTAL SERVIC-
ES CO., INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

American Employers' Insurance
Company, Third Party.

No. 339–80C.

United States Claims Court.

July 9, 1984.

Gary G. Stevens, Washington, D.C., for plaintiff and third party.

Stephen G. Anderson, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

TIDWELL, Judge:

This case, filed pursuant to 28 U.S.C. § 1491, arises out of a timber sale contract between plaintiff, Forest Environmental Services Company ("FESCO"), and defendant, the United States acting through the United States Forest Service. On June 30, 1980 plaintiff filed with our predecessor court a petition seeking recovery of a bid deposit of $24,500 retained by defendant as a result of plaintiff's breach of contract. Plaintiff admits to having breached the contract, but contends that defendant may not retain the bid deposit since it suffered no "actual" damages.[1] Defendant counterclaimed seeking an award for damages resulting from plaintiff's breach and dismissal of the petition. Defendant claims it is entitled to damages in the amount of $89,853.54,[2] as computed pursuant to Clause B 9.4 of the contract with plaintiff. The parties filed cross-motions for summary judgment and oral argument was heard before this court on August 18, 1983.

The court, finding this case to be ripe for decision on summary judgment, holds that Plaintiff's and Third Party's Joint Motion for Summary Judgment seeking recovery of the bid deposit is denied and Defendant's Cross-Motion for Summary Judgment is granted.

## FACTS

On May 7, 1974, defendant awarded the Cerro Pelado Timber Sale, Contract No. 10-1162 to plaintiff. The contract allowed plaintiff three operating seasons, or until November 30, 1976, to cut and remove an estimated 5,100,000 board feet of timber. On June 11, 1974, plaintiff delivered the signed contract and a performance bond, as required by the contract, executed by American Employers' Insurance Company, to Mr. Robert G. Steinhoff, defendant's contracting officer, in Santa Fe, New Mexico for signature.[3]

Serious problems with the transaction arose almost immediately. On June 13, 1974, Mr. A.E. Thomas, of Southwest Insurance Agency, Inc., agent for American Employers' Insurance Company, contacted the Forest Service, and requested the return of the performance bond. Mr. Thomas alleged that there had been a mistake or misunderstanding in connection with the bond and that the home office of the bonding company refused to accept the signature of Thomas B. Gallager, III, on the performance bond but wanted the signature of Thomas B. Gallager, Jr., President of FESCO, instead.[4] Later that same day, defendant released custody of the original bond to Mr. Thomas with the understanding that it would be re-executed and returned very shortly. However, in fact, the original bond was never returned to defendant.

By letter of July 19, 1974, Christobal B. Zamora, Forest Supervisor, directed plaintiff to deliver a performance bond by August 19, 1974 and that failure to deliver the bond "may be treated as a repudiation of

---

1. Plaintiff contends that defendant suffered no actual damages as a result of the breach of contract since defendant received $18,916.88 more on the resale than it would have received on the original contract.

2. The amount claimed by defendant consists of plaintiff's bid deposit of $24,500 plus a judgment of $65,353.54.

3. Mr. Steinhoff indicates, by affidavit of February 24, 1982, that he signed the contract on June 11 or 12, 1974.

4. American Employers' Insurance Company, supported by affidavit, alleges that they were told on June 13, 1974 that the bond was not required, consequently, it was cancelled.

the contract." Plaintiff did not provide another performance bond nor did it attempt to perform the contract. After a series of letters between defendant and plaintiff concerning plaintiff's failure to perform the contract, the Regional Forester, Mr. William D. Hurst, by letter dated September 4, 1975, declared that plaintiff had repudiated the contract by failing to cut timber and offered the sale to American Employers' Insurance Company, as plaintiff's performance bond surety. American Employers' refused to perform the contract or acknowledge the validity of the June 11, 1974 performance bond. Subsequently, on August 31, 1976, the Forest Service resold the Cerro Pelado Timber Sale to Bates Lumber Company.[5]

## PROCEDURAL HISTORY

An initial suit was filed by the United States, on behalf of the Forest Service, in the United States District Court in Albuquerque, New Mexico, Civil No. 77–772M, on November 15, 1977 seeking damages from FESCO in the amount of $65,353.54 plus interest.[6] As part of the suit, the United States joined its claim against American Employers' for $56,000 on the performance bond. Those claims were voluntarily dismissed without prejudice by the United States on December 20, 1977.

Subsequently, on June 30, 1980, FESCO filed suit in the United States Court of

Claims seeking return of its bid deposit.[7] Thereafter, on July 29, 1980, the United States again filed suit against FESCO and American Employers' in the United States District Court for the District of New Mexico, Civil No. 80–635–HB. Defendants (FESCO and American Employers') filed their answers in the District Court action and moved for a suspension of proceedings pending a decision in the present action. The District Court granted plaintiff's motion on January 6, 1982 and that case is now in suspension.

The government's claim against FESCO in Civil No. 80–635–HB has been incorporated into this present action by the government's answer and counterclaim filed September 5, 1980.[8] American Employers' was notified of this present action pursuant to Rule 41 of the United States Court of Claims,[9] and American Employers' appeared by filing an answer to the government's counterclaim.[10] All claims are now before this court on the parties' cross-motions for summary judgment. Jurisdiction is proper under 28 U.S.C. § 1491.

## DISCUSSION

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *South Louisiana Grain Services, Inc. v. United States*, 1 Cl.Ct. 281, 289 (1982). The par-

---

5. The court learned at oral argument that Bates Lumber Company eventually became the owner of FESCO and is now asserting FESCO's claims. Counsel for plaintiff's comment was that "it's a small town."

6. That sum represented the Forest Service's computation of damages under Clause B 9.4 of the timber sale contract ($89,853.54) less the bid deposit ($24,500) paid by FESCO and held by defendant.

7. On October 1, 1982 the United States Court of Claims became the United States Claims Court.

8. Plaintiff also moved for summary judgment with respect to the validity of the performance bond issued in connection with the timber sale contract. However, defendant, in its Cross-Motion for Summary Judgment, questioned the jurisdiction of the court to decide the performance bond issue and in its Opposition to Defendant's

Cross-Motion for Summary Judgment, plaintiff withdrew that issue from review on summary judgment. Thus, the court does not address the validity of the performance bond in this opinion.

9. RUSCC 14(a), adopted October 1, 1982, corresponds to former Rule 41 of the Court of Claims.

10. The issue of whether this court has jurisdiction to bind the third party need not be addressed since American Employers' was noticed in for the sole purpose of avoiding collateral attack on this court's decision before the United States District Court for the District of New Mexico. That issue will be decided by the District Court in a claim currently pending before it.

ties do not raise factual issues which are pertinent to resolution of the issues before the court, and the court is satisfied that there are none. Therefore, based on a review of the pleadings and submissions and after listening to argument, we find that this case is ripe for summary judgment pursuant to RUSCC 56.

### I

It is not disputed that plaintiff breached the contract. The primary issue before the court concerns how damages should be computed as a result of that breach. Both parties agree that damages are to be computed by taking the difference between the value of the defaulted contract and the value of the resale contract plus the cost of the resale. The parties diverge, however, in their "understanding" of when the value of the resale contract should be determined.

The contract provides that Clause B 9.4 is the proper measure of damages in the case of a "termination for breach" or for a "purchaser's failure to cut designated timber ... by termination date".[11] Clause B 9.4 provides:

> Damages due the United States for purchaser's failure to cut and remove such timber meeting utilization standards shall be the amount by which current contract value[12] plus the cost of resale, less any effective purchase credit remaining at time of termination, exceeds the resale value at new bid rates.

Defendant contends that Clause B 9.4, which values the resale contract at its beginning date, should be applied as the measure of damages in this case. Under Clause B 9.4, defendant would be entitled to damages to the extent of $89,853.54 and plaintiff would forfeit its bid deposit of $24,500. Plaintiff, however, rejects the applicability of Clause B 9.4 as the proper measure of damages and urges the court to apply a "common law" damages formula, which values the resale contract at its termination date. Under plaintiff's "common law" damages formula, defendant would suffer no actual damages and plaintiff would be entitled to a return of its bid deposit. Plaintiff's rationale is that defendant ultimately received more money under the resale contract than it would have received under the original contract, thus, defendant suffered no actual damages.

It is well settled that a party to a contract will be bound by the terms thereof, unless there exists some defense to the contract, *i.e.*, fraud, duress, or unless the contract is found to be unreasonable, unconscionable or contrary to public policy, or it produces an egregious, unfair or unreasonable result. *See e.g. United States v. 1,557.28 Acres of Land in Osage County, Kansas,* 486 F.2d 445 (10th Cir.1973). In the absence of such a finding the parties are bound by the contractual provisions. Plaintiff, however, contends that Clause B 9.4 should not be applied to compute damages resulting from plaintiff's admitted breach of the present contract because it allegedly produces an egregious or unfair result and, furthermore, it is contrary to public policy. Plaintiff, in essence, challenges the fairness of Clause B 9.4 on its merits, and specifically challenges the application of Clause B 9.4, in the instant case, by contending that it is an unreasonable measure of damages in that it does not accurately reflect actual damages suffered by defendant. The parties arguments express a basic difference of opinion as to what constitutes "actual damages" and how such damages should be measured under a standard timber sale contract in the event of a breach.

---

**11.** In its initial brief in support of its motion for summary judgment, plaintiff argued that the government was using Clause B 9.4 as a liquidated damages provision. Plaintiff argued further that if Clause B 9.4 were found to be a liquidated damages provision, it would be void as a penalty provision. Defendant argued that Clause B 9.4 was not a liquidated damages provision. The parties, however, now appear to agree that Clause B 9.4 is not a liquidated damages provision.

**12.** The value of the original contract at the date of termination or default.

Plaintiff would have the court look only at the bottom line dollar difference between the amount of money defendant actually received at the end of the resale contract and the amount defendant would have received had the original contract been completed, plus the cost of the resale. Defendant, on the other hand, alleges that the bottom line dollar difference between the value of the two contracts, with the resale contract measured at its termination, is not an accurate measure of actual damages.

Defendant contends that plaintiff's damages formula fails to take into account changes in the market price of timber (both contracts contain a price escalation clause) as affected by the differing time of performance between the two contracts.[13] Furthermore, it fails to protect whatever "bid premium"[14] that the original purchaser paid for the contract. Defendant also contends that plaintiff's formula does not allow for an immediate determination of damages but prolongs damage calculations until the completion of the resale contract. Finally, defendant contends, plaintiff's formula fails to discourage "speculation" on timber sale contracts which is of prime concern to defendant. Defendant asserts

that Clause B 9.4 provides for each of the above contingencies and establishes, by contractual agreement, the time at which damages will be determined; at the beginning of the resale contract.[15]

■ The court is satisfied that the reasons given justify using the clause and, in light of its intended purpose, the court holds that Clause B 9.4 is reasonable and is applicable to the present situation and plaintiff is bound thereby. Thus, we put aside plaintiff's contentions. In our opinion, Clause B 9.4 provides an adequate measure of damages where damages would otherwise be difficult to measure, and we hesitate to supplant our judgment for that of the agency in matters where we have no developed expertise. As support for our holding we look to this court's decision in *Siller Brothers, Inc. v. United States*, 228 Ct.Cl. 76, 655 F.2d 1039 (1981), which approved the computation and award of damages under this same Clause B 9.4. In *Siller Brothers* the court, *inter alia*, interpreted a particular provision of the damages clause and, in so doing, it upheld the clause by approving the award of damages thereunder.[16]

13. The Price Escalation Clause is Clause B 3.2 of the contract. It provides that the purchaser will pay its bid price for each thousand board feet (MBF) of merchantable timber, only if the timber price (the "current" index) is identical to the base index set forth in the contract. If the timber price index has gone up since the time of sale, the current timber price index will be greater than the base index and the purchaser's dollar price will be increased by one-half the difference between the two indexes. If the current timber price index at the time of harvest is lower than the base index, the dollar price charged the purchaser for timber will be reduced by 100% of the difference. Thus, if the current index increases, the government will enjoy a 50% actual dollar increase. If the current index decreases, a purchaser will enjoy a 100% actual dollar decrease in its price.

14. The "bid premium" is that excess amount that a bidder is willing to bid on the contract above its actual market value in order to secure for itself the contract.

15. Clause B 9.4 comes about as the result of a long history of experience with measuring dam-

ages for purchaser breach of timber sale contracts. The clause is the result of careful analysis by the Forest Service with input from the timber industry.

16. In *Siller Brothers* the court, while interpreting the meaning of "new bid rates" as used in B 9.4, held as follows:

When the contract speaks of the resale value at "new Bid Rates," we think it refers to the specific price at which the new contract was let out and not to any escalation of that price during the period of performance. The "Bid Rates" are defined as the "rates bid by Purchaser." * * * Although that rate was subject to quarterly adjustment, there is no indication in the contract that if the contractor defaulted and the government resold the timber, the government's damages were to be calculated upon the escalated rate (amount actually paid) rather than upon the rate the new contractor bid. When the contract refers to escalated rates, it uses the term "Current Contract Rate," not "Bid Rates." We, therefore, conclude that the government correctly calculated the damages.
228 Ct.Cl. at 89, 655 F.2d at 1047.

The arguments before this court are essentially the same as those before the court in *Siller Brothers*. Plaintiff in that case argued that the resale contract should have been valued at its termination date, not its beginning date. The court disagreed and so held. While plaintiff attempts to distinguish *Siller Brothers* by arguing that the court's review therein was limited in scope to interpreting the phrase "new bid rates" and did not reach a broader review of Clause B 9.4 on its merits, we do not agree. In our opinion, the court in *Siller Brothers*, by awarding damages pursuant to Clause B 9.4, approved its use. Thus, plaintiff is merely renewing its effort to persuade the court to abandon its approval of Clause B 9.4 and to adopt a position favorable to plaintiff in this instance. We decline to do so. Accordingly, we hold that plaintiff is bound by the terms of the contract, including Clause B 9.4.

## II.

■ Plaintiff next argues that should the court determine that Clause B 9.4 is the proper measure of damages in this instance, then any award of damages granted thereunder should be reduced by the difference between the estimated amount of timber available and the amount actually cut multiplied by the bid rate. *Louisiana-Pacific v. United States*, 227 Ct.Cl. 757 (1981). Plaintiff's theory is couched in the language expressed in *Louisiana-Pacific* which held that the government may not recover damages when it, in fact, has not been injured.

Plaintiff's argument is that the original estimate for the Cerro Pelado Sale was 5,100,000 board feet of timber, and the amount actually removed at the end of the resale contract was 4,738,794 board feet of timber. This resulted in a 316,000 board feet underrun. Plaintiff asserts that at the very least, the government claim should be reduced by the dollar value of the underrun, $27,804.35.[17]

Plaintiff's argument is again unpersuasive to the court. Plaintiff, in effect, is attacking the validity of the contractually agreed upon damages formula. Clause B 9.4 specifies that the value of the resale contract is equal to the bid rates of the resale contract multiplied by the *estimated* quantity of timber to be cut. The *estimated* quantity of timber was adopted as an acceptable factor in the damages formula to quantify at the outset something that would otherwise be difficult or inconvenient to measure.

Plaintiff, in essence, by making this argument, would require that the parties wait until the resale contract is completed before ascertaining whether actual damages have been incurred. Plaintiff's formula would preclude the Forest Service from assessing and recovering damages from a breaching party in a timely fashion. This argument is simply untenable in light of the clear language of the contract.

Clause B 9.4 is not a simple arithmetic computation of the difference between the actual dollars received at the beginning of the resale contract and what would have been received had the original contract been completed. The formula is more complex and takes into account intangibles such as "bid premiums", and fluctuating timber market prices by the use of the timber index and the price escalation clause and protects the government's initial contractual position by requiring the contractor to assume some of the risks caused by a default on such contracts.

As we stated before, Clause B 9.4 provides a fair, reasonable and accurate assessment of damages. Any change in the formula would impair its effectiveness and accuracy. We refuse to reduce Clause B 9.4 to the status of an interlocutory measure of damages, by providing for a final adjustment of damages based on the amount of timber actually cut rather than on the amount estimated at the beginning of the contract as provided by Clause B 9.4. If we were to do so we would, in effect, be

---

17. 316 MBF × $87.93 = $27,804.35. $87.93 represents the "bid rate" which FESCO was to pay to the Forest Service per thousand board feet (MBF) of timber.

adopting plaintiff's initial position that damages should be measured at the completion of the resale contract, not at its beginning. Therefore, we reject plaintiff's argument and hold that *Louisiana-Pacific* does not apply in this instance. Plaintiff is bound by the express terms of Clause B 9.4 as set forth in the contract. The judgment will remain in tact.

### III.

Plaintiff finally argues that the government failed in its duty to mitigate damages. It is plaintiff's position that the government delayed unreasonably in declaring the contract breached and, that by waiting until completion of the resale contract to do so, it engaged in a blatant attempt to recover a windfall and impose a penalty upon the defaulting contractor.

■ The burden of showing that losses could have been avoided by reasonable effort and expense rests upon the defaulting contractor. *Miller v. United States*, 106 Ct.Cl. 239, 249 (1946). *See Midwest Industrial Painting of Florida, Inc. v. United States*, 4 Cl.Ct. 124, 133 (1983). *See also* McBride and Wachtel, *Government Contracts* § 33.60[3] at 33–70. The burden of proof will shift if the contractor establishes a *prima facie* case of failure to mitigate damages. *See Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank of Evans City*, 611 F.2d 465, 471 (3rd Cir.1979); Appeal of *Associated Food Services, Inc.*, ASBCA 7678, 62 BCA § 3559 (1962). *See aslo* McBride and Wachtel, *Government Contracts*, §§ 33.60[4] at 33–77. Despite plaintiff's contention, plaintiff has not made a *prima facie* case showing that it was unfairly penalized because of the time interval between the date of termination of the original contract and the date of resale. The mere passage of time alone does not mean that the government failed in its duty to mitigate damages. Plaintiff must show that it was prejudiced in some substantial way by the delay. *See Appeal of Skiatron Electronics & Television Corp.*, ASBCA 9513, 65–2 BCA 5053 (1965) citing *Appeal of Standard Engineering &*

*Mfg. Co.*, ASBCA 3733, 57–2 BCA 1477 (1957). *See also* McBride and Wachtel, *Government Contracts* § 33.60[4], at 33–76. Plaintiff makes no specific allegation or contention that any change, such as a change caused by the delay in the actual timber market between the date of termination and the date of resale prejudiced plaintiff.

■ We find instead, based on the facts as presented by the parties, that defendant acted reasonably and we are unable to find that it failed to mitigate damages. *See Midwest Industrial Painting of Florida, Inc. v. United States*, 4 Cl.Ct. 124, 133 (1983); *Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank of Evans City*, 611 F.2d 465, 471 (3rd Cir.1979). The facts are that plaintiff abandoned the contract on August 2, 1974. Defendant formally terminated the contract on September 4, 1975 and resold the contract on August 31, 1976. The resale occurred some three months before plaintiff's time for performance would have expired under the original contract. Until that time, plaintiff contended at oral argument, plaintiff could have performed its contractual obligations. In terminating the contract before plaintiff's period for performance had expired, defendant maintains that it was merely taking reasonable steps to protect itself against what it believed to be plaintiff's abandonment of the contract.

Defendant also contends that it acted judiciously in waiting until September 1975 to terminate the contract because of its inability to locate officers or directors of FESCO. Thereafter, through early 1976, defendant offered the contract to American Employers' as plaintiff's surety. From early 1976 until summer, defendant alleges it was preparing to relet the contract. As previously stated, the time intervals alone do not show that the government failed in its duty to mitigate damages. Plaintiff has not shown that the delay was unreasonable, nor how the passage of time affected the amount of damages involved in the present case, nor has it shown that it was prejudiced thereby. In contrast, defendant

has set forth sufficient facts, supported by affidavit, to justify our holding that its actions were proper and reasonable. Therefore, the amount of damages in the present case, as computed under Clause B 9.4, need not be adjusted for failure to mitigate damages.

## CONCLUSION

IT IS, THEREFORE, ORDERED that Plaintiff's and Third Party's Joint Motion for Summary Judgment seeking recovery of its bid deposit is denied and Defendant's Cross-Motion for Summary Judgment is granted. Defendant is entitled to damages in the amount of $89,853.54, consisting of plaintiff's bid deposit of $24,500 and a judgment from plaintiff of $65,353.54.

Therefore, judgment is to be entered for defendant in the amount of $65,353.54 and plaintiff's petition is to be dismissed.

IT IS SO ORDERED.