Josephine C. RUMLEY, Administratrix of the Estate of George S. Rumley D/B/A George S. Rumley Shoe Manufacturing Company *

v.

UNITED STATES.

No. 286–56.

United States Court of Claims.

Jan. 18, 1961.

---

5. 26 C.F.R. § 40.433(a)–1 (Revised 1953).

* During the pendency of this action, George S. Rumley, who conducted business as George S. Rumley Shoe Manufacturing Co. and who filed this suit, died. His

widow and administratrix was thereupon substituted as party plaintiff. Throughout this opinion, the term "plaintiff" will be used to refer to the plaintiff's decedent, George S. Rumley.

774

Edwin J. McDermott, Philadelphia, Pa., for plaintiff.

Melford O. Cleveland, Wilton, Ala., with whom was Asst. Atty. Gen., George Cochran Doub, for defendant.

DURFEE, Judge.

Plaintiff sues for an amount allegedly due on a contract for the manufacture of duffel bags for the Army. The defendant does not deny that it is indebted to the plaintiff on that contract, but it has asserted a counterclaim based on damages allegedly due under an earlier but

similar manufacturing contract which, if judgment is entered thereon, would leave a net amount owing the defendant.[1]

The first contract in point of time, DA–30–280–QM–3833 (hereinafter referred to as Contract 3833), was awarded to plaintiff on June 16, 1950, pursuant to his bid of 47 cents per duffel bag on 190,-000 units. The bids were opened on June 2, but there is no evidence that plaintiff had received notification that he was the successful bidder prior to June 17, the date on which he wrote to the contracting officer stating that he had made a mistake in his unit bid price. Subsequently, the plaintiff submitted cost estimates to the contracting officer to support his contention that he had seriously underestimated costs in bidding on the contract. In due course, after considering the information supplied by the plaintiff, the contracting officer notified him that he believed the plaintiff's bid was not only unusually low as compared with the figures quoted by other bidders, but that the price was totally inadequate. It was his recommendation that the plaintiff should be relieved of his obligation to perform the contract.

However, in November 1950, the Comptroller General advised the Secretary of the Army that he found no legal basis for increasing the consideration or for releasing the plaintiff from his obligation to perform under Contract 3833. The plaintiff was subsequently advised by the contracting officer that unless assurances of performance of the contract were furnished by January 15, 1951, action would be taken to terminate the contract. Apparently, no such assurances were given and on January 17, 1951, the contracting officer terminated the contract under the authority of the default article. He specifically asserted that the Government reserved its right to repurchase the terminated quantities and hold the plaintiff liable for excess costs.

On June 1, 1951, the defendant executed a number of contracts to secure replacements for the duffel bags which were not manufactured under Contract 3833. It attempted to assess plaintiff for the excess costs incurred in re-letting the work, but the Armed Services Board of Contract Appeals (ASBCA) held that the repurchases were not made within a reasonable time after the notice of termination and, therefore, were not made pursuant to the default article of the contract and could not be assessed against the plaintiff. Nevertheless, the contracting officer continued to assert a claim for excess costs against plaintiff and in November 1953, the General Accounting Office issued a settlement against him in the net amount of $15,665.44 after allowing an offset for the amount the Government owed under a later duffel bag contract, DA–30–280–QM–12130 (hereinafter referred to as Contract 12130), which contract is the one sued on by plaintiff in this action.

The position of the defendant as to its counterclaim is that Contract 3833 was a valid contract which was breached by the plaintiff. Although the defendant accepts the ASBCA holding that it waited too long in making the repurchases to attempt to assert them as excess costs under the contract, it insists that the terms of the contract preserve its common law right to damages for breach ·of contract. It suggests what it believes is a fair measure of damages but, inasmuch as the plaintiff is insolvent, it asks to be awarded only so much as is necessary to offset any judgment the plaintiff might be awarded under Contract 12130.

The plaintiff, on the other hand, takes the position that a serious, bona fide error was made in the bid price on Contract 3833 of which the defendant had knowledge and, as a result of which no binding contract came into being. Alternatively, he argues that the termination action of

1. The Government has also asserted a second counterclaim for packing and transportation costs under still another manufacturing contract which it had with the plaintiff, Contract DA–30352–TAP–1904. However, the plaintiff has admitted his liability for those costs and has conceded that that amount will be an offset against any amount he may be awarded on his claim arising under Contract 3833.

the contracting officer amounted to a rescission of the contract which precluded the defendant from thereafter asserting a claim based on a theory of breach of contract.

To determine the final position of the parties vis-a-vis each other, we must decide whether the defendant has a valid claim for common law contract damages on Contract 3833 and, if so, how those damages are to be measured.

■ A consideration of whether the contract was breached, as the Government contends, cannot begin without a discussion of plaintiff's contention that no enforceable contract existed. Though it is quite possible that plaintiff made a miscalculation in arriving at his bid price, it is not at all clear that this error was so gross and so manifest as to have necessarily and immediately indicated to the contracting officer a mistake fatal to a meeting of the minds.

Three bidders in addition to the plaintiff submitted bids of less than 60 cents per unit for all or some of the delivery points. While some of the unit bid prices were as high as two dollars and higher, more than 50 percent of the bids was one dollar or less. And so we see not a group of price quotations concentrated at or near a certain figure with the plaintiff's price standing alone far below this point, but a widespread distribution of estimated prices of which plaintiff's price is the lowest.

When plaintiff first made a complaint about his bid price in the letter of June 17, 1950, he requested only a three-fourths of a cent increase in the unit price, apparently based on the change in packing requirements, but he did not attempt to withdraw from the contract. Even on June 24, 1950, when he furnished the contracting officer with additional information, he requested an adjustment in unit price to 54 cents, an increase over the original bid price of only seven cents.

Under these circumstances we do not feel that the contracting officer was on notice of a unilateral mistake, so demonstrably gross that awarding Contract 3833 to the plaintiff at that price amounted to an attempt to take unconscionable advantage of the error.

■■ There is less reason for us to hesitate on the question of whether the plaintiff was in breach of Contract 3833. Following a number of conferences between the parties concerning adjustments in the contract, plaintiff wrote the contracting officer on December 28, 1950, indicating a reluctance to perform. The contracting officer replied that he interpreted the letter as a refusal to perform. He rightfully excused the defendant's failure to supply government-furnished-property in view of the plaintiff's position. In refusing to perform the plaintiff was clearly in default of the contract under circumstances amounting to a breach. Plaintiff has not challenged the ASBCA determination sustaining the contracting officer's notice of termination and his determination that the default resulted from causes within plaintiff's control. Though we are not necessarily bound by the administrative determination which amounted to a holding that plaintiff was guilty of a breach, we think that the fact of plaintiff's refusal to perform cannot be interpreted in any other way.

■ The defendant's contracting officer did not rescind the contract, as suggested by the plaintiff. Rescission contemplates a return by the parties to the status quo. Unlike the typical rescission where both contracting parties are rid of the obligations imposed by a contract, the defendant did not wish to dissolve the contractual ties; rather, it wished to hold the plaintiff to the agreement which had been made. The default for which the defendant terminated the contract was not a mere matter of convenience freeing both parties from an undesirable contract relationship. It was a termination forced by the plaintiff's breach of his obligation to perform under the contract.

■ Ultimately, then, plaintiff is faced with an enforceable contract which

will not be performed because of his breach and not as a result of any act of rescission. The defendant acquiesces in the ASBCA decision that the repurchases for Contract 3833 were not made in such reasonable time as would permit it to assert excess costs against the plaintiff. However, the defendant insists that it has a common law right to damages for breach of the contract, measured by the difference between the contract price and the reasonable replacement cost of the contract items, in addition to its specific contract remedies.

Although the remedy provided for in clause 11(c) namely, the recovery of excess costs, was lost by the defendant because of its tardiness in re-letting the contract, clause 11(f) tells us that "[t]he rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract."

We think that this contract provision reserved to the defendant any common law remedies which it may have had, at the same time recognizing the right to assert claims for excess cost under clause 11(c). In point of fact, all that provision 11(c) does is to take a common law rule for determining damages for breach of contract, the difference between the contract price and the reasonable cost of obtaining performance after the breach, and say that if the Government repurchases within a reasonable time, the repurchase price will be accepted as the reasonable cost of obtaining performance with no further proof required.

■ Though the defendant may not now satisfy its burden of proving damages merely by showing what was the unit price on the re-letting of Contract 3833, we think that it should be given the opportunity to show, as a matter of common law contract damages, how much the cost of obtaining performance was

increased as a result of the plaintiff's breach. The record discloses sufficient evidence on which we may project a unit bid price which would represent the reasonable cost in the market of obtaining the items originally covered by Contract 3833. Between May 4, 1950, the date on which the plaintiff submitted its bid on Contract 3833, and June 1, 1951, the date on which the defendant entered into the replacement contracts, a number of duffel bag contracts, in addition to the replacement contracts, were entered into by the defendant. Ordinarily, there was from one to two-months' elapsed time between invitations to bid and the awarding of the contracts. The May 1950, to June 1951, period was one of steadily rising costs and bid prices. In September 1950 the successful bidders had bid as low as 47 cents per unit. By March 1951, successful bidders were bidding as high as 68 cents. The plaintiff himself received a contract for 50,000 units in April 1951 at a unit price of 68 cents.[2]

The bids submitted in mid December 1950, approximately one month before termination, averaged 53 cents per unit. The bids submitted in mid March 1951, approximately two months after termination, averaged 66 cents per unit. Both average figures include bids for export as well as domestic supply. If we assume that a reasonable date for requesting bids was immediately after the termination, to wit, mid-January 1951, and if we assume that bid prices rose uniformly between December and March, we arrive at an average unit price for mid-January of 61.7 cents. At that unit price, the cost of securing replacement items for the 190,000 units of Contract 3833 is $117,230. This figure is $27,930 more than the total price of the breached contract and represents the amount due the defendant on its counterclaim.

However, the defendant has only requested judgment on its counterclaim to

---

2. The various unit bid prices on replacement contracts, the dates of their submission, and the component bids includ-ed in the various average bid prices, are to be found in Finding No. 18.

the extent required to offset any judgment awarded the plaintiff on his principal claim, inasmuch as the plaintiff is insolvent and the defendant does not expect to be able to satisfy any net judgment which it might receive. In the circumstances of this case, we think that the Government's request is reasonable and will result in substantial justice to both parties.

Accordingly, the plaintiff is entitled to recover the amount of $12,840 on its claim based on Contract DA–30–280–QM–12130. The defendant is entitled to recover a like amount on its counterclaims based on Contract DA–30–280–QM–3833 and Contract DA–30–352–TAP–1904. These amounts offset each other and thus no net judgment will be entered in favor of either party.

It is so ordered.

JONES, Chief Judge, and WHITAKER, MADDEN and LARAMORE, Judges, concur.