**ENGLE INVESTORS, An Oregon Partnership, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 350–88C.

United States Claims Court.

Nov. 27, 1989.

Joseph A. Yazbeck, Jr., Portland, Or., for plaintiff.

David Sadoff, Washington, D.C., with who were Asst. Atty. Gen. John R. Bolton, Director David M. Cohen, Asst. Director Helene Goldberg, for defendant. William P. McGinnies, of counsel.

OPINION

LYDON, Senior Judge:

Plaintiff in this contract case, challenges a damages assessment of $583,146 against it by the United States Department of Agriculture, Forest Service (Forest Service) as a result of plaintiff's failure to complete a contract it had with the Forest Service "to cut, remove and pay" for specified quantities of timber located in the Rigdon Ranger District of Willamette National Forest in Oregon within the time period specified in the contract, as extended. Plaintiff's failure to timely complete this contract is not an issue in this case. What

is in issue is plaintiff's contention that defendant failed in its duty to mitigate the damages defendant incurred in entering into a resale contract relative to the quantity of timber that plaintiff had failed "to cut, remove and pay" for in the Rigdon Ranger District. In response to plaintiff's complaint, defendant, in its answer, sets forth a counterclaim and a demand for judgment in the amount of $583,146 plus interest.[1]

Both parties have moved for summary judgment, each asserting that there are no genuine issues as to any material fact, and each asserting entitlement to judgment as a matter of law. Upon consideration of the submissions of the parties and oral argument, the court concludes that both motions for summary judgment must be denied as genuine issues of material fact are in dispute.

### Facts

Plaintiff contracted with the Forest Service on April 14, 1983 to cut, remove and pay for specified timber in the Rigdon Ranger District. The Contract, No. 075469, was known as the Jagger Timber Sale Contract (Jagger Sale Contract). This Contract, as extended, was to be completed by plaintiff by June 12, 1986. However, plaintiff failed to complete the contract by June 12, 1986, and its failure to do so has not been shown to be excusable. Accordingly, plaintiff was in default on the Jagger Sale Contract.[2] Plaintiff, in its complaint, does not contest the Forest Service's termination of its right to proceed further with the Jagger Sale Contract because of its

failure to cut the designated timber within the sale period specified in the Contract, as extended.[3]

The total sale volume of timber offered on the Jagger Sale Contract was 13,200 MBF, including per-acre material. This broke down to some 9,900 MBF of net scale timber and 171 acres of per-acre material. The total estimated contract price for this sale was $1,665,526. The downpayment required for this sale was $83,000, which was approximately five percent of the estimated sale price. Plaintiff made this downpayment. As of June 12, 1986, the contract termination date, plaintiff had removed some 2,661 MBF of net scale timber.

Special Provisions of the Jagger Sale Contract (section B9.4) provided, in pertinent part: "[I]n event of ... Purchaser's failure to cut designated timber on portions of Sale Area by Termination date, Forest Service shall appraise remaining Included Timber.... Such appraisal shall be made with the standard Forest Service method in use at time of termination." Section B9.4 further provided that "Damages due the United States for Purchaser's failure to cut and remove such timber meeting Utilization Standards shall be the amount by which Current Contract Value plus the cost of resale, ... exceeds the resale value at new Bid rates...."

Subsequent to June 12, 1986, the Forest Service reappraised, readvertised and resold that portion of the Jagger Sale Contract that plaintiff failed to complete. That resale occurred on March 24, 1987, which was prior to the next operating season

---

1. Plaintiff, in its complaint, does not seek a money judgment but seeks to overturn the contracting officer's decision that it owes defendant $583,146. Since an express contract is involved and since it is a government claim that is at issue, the court has jurisdiction of the matter under 28 U.S.C. § 1491 (1982) and 41 U.S.C. § 609(a)(1) (1982). *See Elgin Builders, Inc. v. United States,* 10 Cl.Ct. 40, 44 (1986). *See also Ralcon, Inc. v. United States,* 13 Cl.Ct. 294 (1987).

2. The operating season, the cutting and removal of timber, under the Jagger Sale Contract, was from June 1 through November 30. The operating season was also applicable to contracts which are subsequently resold. While plaintiff

had three operating seasons (1983, 1984, 1985) within which to complete the Contract, it had only cut and removed 27% of the timber covered by the Contract.

3. It is interesting to note that plaintiff did not seek an extension of the Contract in light of the Forest Service's well-established practice or custom with respect to granting such extensions. *See Everett Plywood Corp. v. United States,* 206 Ct.Cl. 244, 255–58, 512 F.2d 1082, 1088–90 (1975). Plaintiff's decision to default on its contractual obligations may well have been due to conditions in the timber industry. *See* n. 10, *infra. See also Pine Products Corp. v. United States,* 15 Cl.Ct. 11 (1988).

following plaintiff's default of the Jagger Sale Contract. The resale is referred to as the "Jagger Resale Contract," and is to be distinguished from the "Jagger Sale Contract." The total volume of timber offered on the Jagger Resale Contract was 6,500 MBF, and 127 acres of per-acre material, for an estimated total of 8,846 MBF. The estimated contract price of the Jagger Resale Contract was $992,038.71. The downpayment required for the Jagger Resale Contract was $150,205.32 which was around fifteen percent of the purchase price.[4]

Following completion of the Jagger Resale Contract (No. 084396), the contracting officer, on May 9, 1988, issued a final decision assessing, pursuant to section C9.4—"Failure to Cut" Provision in the Jagger Resale Contract, damages against plaintiff in the amount of $583,146. This decision set forth "Findings", one of which read as follows:

4. The [Jagger] sale was resold March 24, 1987 under changed conditions. Special Provisions C.4220—Downpayment (11/85) and C4.26—Midpoint Payment (11/85) were included in the resale contract.

The contracting officer enclosed with his decision a "Bill for Collection" demanding payment from plaintiff, as damages, of $583,146 due May 24, 1988, for failure to fully perform the Jagger Sale Contract.[5]

In addition to the larger downpayment required, the Jagger Resale Contract also required from the purchaser a midpoint payment of at least $273,000 for timber scaled, including required deposits. No such midpoint payment was required in the Jagger Sale Contract. The downpayment deposit was retained until the purchaser cut, removed and paid for twenty-five per-

cent of the contract timber at which time the downpayment was released to the purchaser. The midpoint payment required plaintiff to have paid at least $273,000 for timber scaled, including required deposits by November 30, 1987. To the extent the purchaser paid for timber worth less than $273,000 by the specified date, the purchaser would have to pay an adjusted midpoint payment to make up the difference. The purpose of the higher downpayment and the midpoint payment was to protect the public interest by encouraging the prompt and orderly removal of timber. It was not to increase bidder's costs. In fact, there was no actual midpoint payment billing on the Jagger Resale Contract. Finally, the Jagger Resale Contract also modified in certain respects the Failure to Cut Provision (B9.4) in the Jagger Sale Contract, which plaintiff defaulted.

A Forest Service official, the Assistant Timber Staff and primary contracting officer for the Willamette National Forest, responsible for, inter alia, the administration and monitoring of the Forest's timber sale program, states in his declaration that the larger downpayment required for the Jagger Resale Contract, as well as the required midpoint payment, "could have an effect on the amount bid" for the Jagger Resale Contract. The Forest Service acknowledged these two items as "changed conditions" in the Jagger Resale Contract relative to the defaulted Jagger Sale Contract, but Forest Service policy, manifested by regulations, issued in November 1985, in effect at the time the Jagger Resale Contract was executed in March 1987 mandated their inclusion in all contracts. However, the Forest Service calculated the cost of these two items to a subsequent purchaser, based on the time value of money,

4. There was a volume difference of 4,354 MBF (13,200–8,846) between the Jagger Sale Contract and the Jagger Resale Contract. Further, there was a downpayment difference of some $67,205 (150,205–$83,000) between the Jagger Resale Contract and the Jagger Sale Contract.

5. The Forest Service calculated the damages as follows:

| | |
|---|---:|
| Current Contract Value of Uncut Timber on June 12, 1986—the Jagger Sale Contract Termination Date | $1,389,036 |
| Plus Cost of Resale | 2,400 |
| Plus Interest, Special Provision C9.4 | 199,092 |
| Adjustment for Changed Conditions [Downpayment and Midpoint Payment] | 15,344 |
| Less Resale Bid Value | 992,038 |
| Damages Sought by Government | $ 583,146 |

and the amount so determined was deducted from any damages that might be assessed against the prior defaulted purchaser. In assessing damages against plaintiff, a deduction for the $150,205.32 downpayment was calculated based on seven percent annual interest for a period equal to one-half the contract term. Likewise, a deduction for the midpoint payment was figured using one-eighth of the contract term. By these calculations, the Forest Service reduced the damages by $15,344 to take into account any impact the higher downpayment and the midpoint payment requirement might have had in lowering the bid price on the Jagger Resale Contract.

In its complaint filed on June 14, 1988, plaintiff avers that defendant failed to properly mitigate the damages it incurred as a result of plaintiff's failure to cut and remove the timber specified in the Jagger Sale Contract by the termination date set forth in the Contract, as extended, in the following particulars: (1) The contract termination date in the Jagger Resale Contract was March 31, 1989. As of the termination date, June 12, 1986, of the Jagger Sale Contract, plaintiff had only cut and removed twenty-seven percent of the timber covered by the Contract (*see* n. 2, *supra*). Yet, plaintiff stresses, the operating seasons for the Jagger Resale Contract were reduced from three operating seasons to two operating seasons. This difference, plaintiff avers, between the Jagger Sale Contract and the Jagger Resale Contract contributed to the lower purchase price on the Jagger Resale Contract;[6] (2) "A downpayment of twenty-five percent of the advertised sale volume was required [on the Jagger Resale Contract] as opposed to a downpayment of five percent on the initial sale [the Jagger sale]." The twenty-five percent figure is not supported by the materials before the court. This difference in downpayment requirements consititutes, in plaintiff's view, a significant and substantial difference between the two contracts such that the purchase price of the Jagger Resale Contract was lowered significantly. Since defendant's damage assessment is significantly based on the difference between the purchase price of the Jagger Sale Contract and the purchase price of the Jagger Resale Contract, the Forest Service's action in requiring a larger downpayment for the Jagger Resale Contract supports, in plaintiff's view, the contention that defendant failed to properly mitigate damages and, thus, waived and/or forfeited any right to recover any damages from plaintiff.[7]

*Discussion*

Plaintiff maintains the Forest Service failed to mitigate damages by offering the Jagger Resale Contract under more "onerous" terms than those contained in the original Jagger Sale Contract. These more burdensome terms, plaintiff argues, discouraged bidders from vying for the Jagger Resale Contract and, thus, depressed the purchase price the Forest Service realized on the resale.

Examples of such "onerous" terms, according to the plaintiff, were the "greatly increased" cash downpayment required on the Jagger Resale Contract, the midpoint payment, and a "low" interest deduction to

---

**6.** Plaintiff does not discuss this contention in its briefs, and it is not unreasonable to consider that it has been abandoned. *Ulman v. United States,* 214 Ct.Cl. 308, 314, 558 F.2d 1, 4 (1977); *Nossen v. United States,* 189 Ct.Cl. 1, 18, 416 F.2d 1362, 1371 (1979), *cert. denied,* 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970); *Prindle v. United States,* 5 Cl.Ct. 493, 495, n. 7 (1984); *Sheets v. United States,* 2 Cl.Ct. 101, 102, n. 2 (1983). In any event, there is no persuasive evidence in the materials at hand that indicates the above observation by plaintiff impacted in any significant way on the price bid for the Jagger Resale Contract. The court finds the contention to be merely an insignificant observation.

**7.** It is to be noted that plaintiff does not allege in its complaint, or argue in its briefs, that defendant, absent the mitigation defense, is not entitled to damages because of plaintiff's default on the Jagger Sale Contract, or that the Forest Service's use of $1,389,036 as the current value of uncut timber on the termination date and the use of $2,400 as the cost of resale in its calculations are in any way flawed. Accordingly, issues or claims on those two matters, if indeed they exist, are also deemed abandoned. *See* n. 6, *supra.*

compensate for these "changed conditions" utilized by the Forest Service in its damage calculations. Plaintiff's expert forester, Lucien B. Alexander (Alexander), contends by affidavit and by declaration that the large cash outlay required of the prospective purchaser as a result of the large downpayment and midpoint payment drove down the resale price below the level the Forest Service otherwise could, and should, have realized. He felt that these changed conditions limited the pool of available potential bidders. Parenthetically, it is interesting to note that twelve bids were received in response to the 1983 sale and twelve bids were received in response to the 1987 sale. Alexander believed the most important difference between the original contract and the resale contract was the increased downpayment requirement of the resale contract. Alexander further avers that the seven percent interest deduction calculated by the Forest Service was too low because commercial loans to purchasers were unavailable at such a favorable rate at the time. Alexander maintains that the differing terms of the Contracts—the high downpayment and midpoint payment—offer the only reasonable explanation for the low resale price the Forest Service ultimately received, because prevailing timber bid prices at the time the Forest Service resold the defaulted contract "were generally higher" than those that existed when plaintiff entered the Jagger Sale Contract.

If the contract damage determination terms had remained unchanged, Alexander posits, "it is more likely" that the Forest Service would not have incurred any damages at all and even might have registered a "net gain" on the resale, thereby mitigat-

ing any damages flowing from plaintiff's default on the original Jagger Sale Contract. By failing to mitigate these damages, plaintiff asserts, the Forest Service effectively waived or forfeited its right to collect the amount stipulated in its Bill of Collection, and plaintiff, thus, is entitled to summary judgment.

Plaintiff contends the Forest Service had a duty to mitigate the damages it incurred as a result of plaintiff's default of the Jagger Sale Contract, citing *Siller Brothers, Inc. v. United States*, 228 Ct.Cl. 76, 84, 655 F.2d 1039, 1044 (1981), *cert. denied*, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982). Interestingly, the Court of Claims in the *Siller* case found that the Forest Service had not failed in its duty to mitigate a resale contract following a default, rejecting the defaulted contractor's contention that the Forest Service was required, as part of its duty to mitigate, to escalate various prices in its damage calculations. *Id.* 228 Ct.Cl. at 86–89, 655 F.2d at 1045–47.

■ That the Forest Service had a duty to mitigate damages is conceded in this case. Indeed, the Forest Service recognized this fact in making adjustments in its damage calculations. In mitigating its damages, plaintiff asserts, the Government may use any right or remedy provided by law or by contract, citing *Rumley Shoe Mfg. Co. v. United States*, 152 Ct.Cl. 166, 285 F.2d 773 (1961).[8] The issue, plaintiff asserts, is whether the Forest Service's mitigation efforts were reasonable. If not, plaintiff continues, the Forest Service must be held to have waived or forfeited its right to seek the difference between the value of the original Jagger Sale Contract and the value of the Jagger Resale Contract.[9]

8. While the Government in *Rumley* lost the damage rights provided it by the contract, relative to a defaulted contract, the Court of Claims held that the Government had a common law right for determining damages for the contractor's breach of contract, *i.e.*, the difference between the contract price for the defaulted contract and the reasonable cost of obtaining performance after the breach, and if the Government obtains performance "within a reasonable time, the repurchase [resale] price will be accepted or the reasonable cost of obtaining performance with no further proof required."

*Rumley, supra*, 152 Ct.Cl. at 171, 285 F.2d at 777. *See also Marley v. United States*, 191 Ct.Cl. 205, 221–23, 423 F.2d 324, 333–34 (1970). The fact that the Forest Service mistakenly attempted to exercise a right under the 1987 C9.4 clause is no defense to enforcement of the actual right available under the defaulted contract (clause B9.4). *Jadwin v. Hoyt*, 1 F.2d 784, 786 (7th Cir.1924).

9. Plaintiff defaulted on the Jagger Sale Contract, a breach of contract, causing the Forest Service to complete performance of that contract by

Defendant challenges plaintiff's two central premises. Defendant questions whether the increased downpayment, which it defends as statutorily mandated, caused the price received on the Jagger Resale Contract to be lower. Defendant also questions the validity of plaintiff's conclusion that prices which prevailed at the time of the Jagger Resale Contract significantly exceeded those which existed when plaintiff entered into the original Jagger Sale Contract. Instead, defendant claims the price the Forest Service fetched upon resale of the defaulted contract may have been affected by plaintiff's own actions. By engaging in a form of "high grading," defendant maintains, plaintiff removed low-cost "white woods" while performing only twenty-seven percent of the Contract and left behind, after defaulting on the Contract, the high-priced Douglas-fir, a practice the Forest Service alleges may have maximized plaintiff's profits on the work it did perform on the Contract but also may have affected negatively the bidding activity and, therefore, the bid price for the Jagger Resale Contract.

Defendant further asserts that plaintiff failed to show that timber prices which prevailed at the time of resale were actually higher, because plaintiff based its conclusion on timber sales data relating to Bureau of Land Management (BLM) timber sales and not on Forest Service timber sales. Defendant states that, in order to show that a higher market price for timber existed at the time of the resale than that

which existed when the defaulted contract was formed, plaintiff should have based its conclusive calculations on the appraisal method utilizing Forest Service sales figures issued by the BLM. Defendant further suggests that Alexander, plaintiff's expert, misrepresented BLM sales data and misstated Forest Service sales data.

Defendant further maintains that plaintiff cannot establish a prima facie case demonstrating the Forest Service's failure to mitigate damages on the resale, unless plaintiff employs the Forest Service's method. Defendant claims its actions were reasonable because it used a "contractually agreed upon" method to calculate the damages and reduced plaintiff's damages by $15,344 accordingly to compensate for any possible negative impact because of changed conditions relating to the downpayment and midpoint payment, which, although not "contractually agreed upon," defendant avers are statutorily mandated to control speculative bidding on timber sale contracts.[10]

Plaintiff argues that the buy-out provisions of 16 U.S.C. § 618 (1982 & Supp. V 1987) entitled, "Timber Contract Payment Modification," do not require the Forest Service to obtain an increased downpayment of at least ten percent on timber resale contracts, as claimed by the Government, but that the Forest Service merely chose to do so. The plaintiff further argues that the Forest Service was not autho-

means of another contract, the Jagger Resale Contract. What the Forest Service sought to recover from plaintiff was the excess costs it incurred because of plaintiff's breach of contract. Under the law of breach of contract damages, a failure to mitigate damages need not prevent any award of damages but only affect the amount of damages to be awarded. *Marley, supra,* 191 Ct.Cl. at 221, 423 F.2d at 333 (1970).

10. During the late 1970's and into early 1980's rampant inflation, inter alia, caused many timber companies to contract for timber from the government at prices well above the market prices. That meant that at current prices companies under timber contracts with the government could not convert the timber into marketable products without incurring substantial losses. *See Sierra Pacific Indus. v. Block,* 643 F.Supp. 1256, 1263 (N.D.Cal.1986) *aff'd in rele-*

*vant part,* 866 F.2d 1099 (1989). *See also* 16 U.S.C. § 618(c) (1982 & Supp. V 1987); 36 C.F.R. § 223.49(c)(1), .50 (1988). This legislation was designed to lessen rigid insistence by the government on enforcement of its timber contracts so as not to have a "devastating impact" on the timber industry. Under this legislation, purchasers of qualifying federal sales contracts were allowed to "buy out" up to 55% of the contract timber volume remaining to be cut in accord with specified conditions and qualifications. *See Pine Products,* n. 3 *supra.* Plaintiff was not eligible to "buy out" its contract with the Forest Service. What effect, if any, this had on plaintiff's failure to complete the Jagger Sale Contract within the contract's specified period is a matter of speculation and conjecture on the basis of the materials before the court.

rized, in any event, to levy a midpoint payment on such contract. A reading of the legislation in question and applicable regulations do not support plaintiff's generalized attack in this regard. The Buy–Out Act, and regulations implementing the Act, do require the Forest Service to require a higher than before downpayment and midpoint payment in all Forest Service timber contracts entered into after 1985.

Plaintiff maintains the Forest Service should have used only the following method outlined in clause B9.4 of the Jagger Sale Contract in assessing damages against it: Damages equal the amount by which the current contract value plus the cost of resale, exceeds the resale value at new Bid Rates....

Plaintiff correctly points out that the method outlined in clause B9.4 does not grant defendant the contractual right to apply a seven percent interest rate as compensation for the changed conditions, *i.e.*, the increased downpayment and midpoint payments contained in the Jagger Resale Contract's terms. Plaintiff notes that the B9.4 clause had not changed since 1973. Plaintiff also correctly notes that regulations authorizing the increased downpayment and midpoint payment resulting in the seven percent interest adjustment did not become effective until October 11, 1985. *See* 36 C.F.R. § 223.49, .50 (1988).

Plaintiff argues that because the clause in the defaulted contract is devoid of any provision for a similar interest adjustment calculation and because the regulations authorizing such a provision post-dated the defaulted contract, the Government is precluded from employing such an interest adjustment figure in calculating damages pursuant to plaintiff's default on the Jagger Sale Contract. Even if an interest assessment were applicable, plaintiff states, the Forest Service's seven percent figure is lower than any interest rate at which a prospective purchaser realistically could have obtained a commercial loan to subsidize the Jagger Resale Contract at the time it was entered into. Consequently, plaintiff maintains, defendant's calculation of the damages, in any event, is of questionable accuracy.

Plaintiff concludes that utilization of the increased downpayment and midpoint payment and application of the low interest rate to compensate for these changed conditions, supports the view that defendant failed to take reasonable steps to mitigate damages flowing from plaintiff's default on the Jagger Sale Contract. As a result of its failure, plaintiff concludes, the Government forfeited any damages it incurred as a result of plaintiff's breach of the Jagger Sale Contract.

■ The court concludes that plaintiff is correct when it says defendant was required to calculate damages in accord with the provisions (section B9.4) of the defaulted contract. This was what the parties agreed to in the event of contract termination and this is what the parties had a right to expect when the termination occurred. *See Everett, supra,* 206 Ct.Cl. at 254–56, 512 F.2d at 1088–89. In seeking damages, defendant must rely on the express terms of the terminated contract and cannot, as it attempts to do in this case, import into the breached contract terms in another contract or terms outside those expressly contained in the breached contract. *State of Texas v. United States,* 210 Ct.Cl. 522, 531, 537 F.2d 466, 471 (1976). On the other hand, the court cannot accept plaintiff's position that the Government waived any right to damages because it selected the provision in the resale contract as the basis for its damage computation. Under the circumstances of this case, the court holds that defendant's failure to correctly compute the damages due it for plaintiff's default of the Jagger Sale Contract does not serve to deprive the defendant of any damage award, but it may serve to affect the amount of that award.

■ Defendant argues that the Forest Service was "mandated" by the Federal Timber Contract Modification Act, Pub.L. No. 98–478, 98 Stat. 2213, 16 U.S.C. § 618 (1984) (the "Buy–Out" Act), to utilize the C9.4 provisions of the Jagger Resale Contract, entered into in March 1987, in computing the damages due it for plaintiff's

default of the April 1983 Jagger Sale Contract. Generally, the damage provisions of the defaulted contract should control and not the damage provisions of a later contract unless there is a clearly established basis for doing otherwise. The court can find no such basis in this case.

A careful reading of the Buy–Out Act and its legislative history, S.Rep. No. 596, 4 U.S.CODE CONG. & ADMIN.NEWS 3796 (1984), shows that the provisions of that Act were not intended to be applicable to a contract entered into in March 1983. Indeed, section 2(d) of the Act provides that the cash downpayment and periodic payment provisions, which defendant utilized in its damage computations, were to become effective "in any contract for the sale of timber from the National Forests" on January 1, 1985, 16 U.S.C. § 618(d). While these provisions were "mandated" for the Jagger Resale Contract, they were not "mandated" nor applicable for or to the Jagger Sale Contract. In substance, defendant applied the Buy–Out Act provisions (section 2(d)) retroactively to the 1983 Jagger Sale Contract. Retroactive application of a statute and/or regulations to a contract awarded earlier are not favored. In this case, no statutory basis exists to apply the Buy–Out Act provisions retroactively to the 1983 Jagger Sale Contract. *See Bowen v. Georgetown Univ. Hosp.*, — U.S. —, 109 S.Ct. 468, 471–75, 102 L.Ed.2d 493 (1988). Accordingly, the provisions of section B9.4 of the Jagger Sale Contract must govern the computation of damages due defendant in this case.[11]

Plaintiff argues that since defendant failed to compute the damages properly, it failed to mitigate damages and, thus, waived or forfeited its right to be awarded any damages. The court does not agree.

The court agrees that the Forest Service was under a duty to mitigate damages. This means, in the case at bar, that plaintiff, who breached the contract, is not to be charged with damages which the Forest Service could have avoided with reasonable effort and without undue risk or expense since such damages are not caused by plaintiff's breach of contract.

Accepting at face value plaintiff's contention that the Forest Service failed to mitigate damages does not mean in this case that the Forest Service cannot collect any damages.[12] *See 5 McBride & Wachtel, Government Contracts*, § 33.60[6], at 31–81 (1984); *Gregory Timber Resources, Inc.*, 87–3 B.C.A. (CCH) para. 20,086, 101,-681, 101,690 (1987), *aff'd*, 855 F.2d 841 (Fed.Cir.1988). In *Alabama Shirt & Trouser Co. v. United States*, 121 Ct.Cl. 313, 332 (1952), the Court of Claims, while finding that the Government failed to mitigate damages resulting from a contractor's breach of contract, nonetheless allowed the Government to recover reduced damages because of the breach. A similar result is called for under the circumstances of this case. Finally, it is not without significance to remember that plaintiff only performed twenty-seven percent of the Jagger Sale Contract after over three years, with the Contract being terminated for failure to complete it within the time called for by the Contract, as extended. No excuse was offered for this breach. The holding asked by plaintiff, that its entire liability for its breach of contract be expunged, would be, under the circumstances, inequitable. *Consolidated Air Borne Sys., Inc. v. United States*, 172 Ct.Cl. 588, 601, 348 F.2d 941, 948 (1965), citing *United States v. Warsaw Elevator Co.*, 213 F.2d 517, 519 (2d Cir. 1954). The correct view, under the circum-

---

**11.** The section B9.4 damages provisions are, in substance, similar to the common law breach of contract damage computations and have received judicial approval as a reasonable damage response to a default of a timber sale contract. *See Siller, supra*, 228 Ct.Cl. at 87–89, 655 F.2d at 1046–47; *Forest Envtl. Servs. Co. v. United States* (FESC), 5 Cl.Ct. 774, 778 (1984).

**12.** Actually, the Forest Service did make an effort to mitigate damages as witnessed by its

attempt to put a dollar value on the changed conditions (increased downpayment and midpoint payment) present in section C9.4 and subtracted this dollar value from damages that would otherwise be assessed. This effort to mitigate, although tainted by the mistaken belief that use of section C9.4 was mandated, militates against absolving plaintiff of all damage responsibility for its breach of contract.

stances of this case, is that defendant's failure to properly compute damages does not prevent an award of damages to it but may lessen the amount so awarded. *See Dillon Total Maintenance Inc. v. United States,* 218 Ct.Cl. 732, 734–35 (1978); *Doehler Metal Furniture Co. v. United States,* 149 F.2d 130, 133–34 (2d Cir.1945).

The court determines that section B9.4 of the Jagger Sale Contract provides the correct damage starting point. Under this section, the current contract volume plus the cost of resale—minus the price of the Jagger Resale Contract provides the foundation for a damage computation. The materials before the court do not show a dispute between the parties as to the current contract value figure ($1,389,036) or the cost of resale ($2,400). What is in dispute is the reasonableness of the price of the Jagger Resale Contract ($992,038).

■ Reasonableness is a question of fact. *See generally Astro–Space Labs, Inc. v. United States,* 200 Ct.Cl. 282, 308, 470 F.2d 1003, 1017–18 (1972). Both parties provide affidavits and/or declarations that establish quite clearly that there is a dispute about a material issue of fact, *i.e.,* the reasonableness of the resale price. A material fact is one which will make a difference in the result to be reached herein. *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Since a genuine issue of material fact exists, summary judgment is inappropriate in this case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. Kress,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See also Doehler, supra,* 149 F.2d at 134–35 (summary judgment not appropriate where price in relet contract is at issue). Generally, where a

resale contract contains the same terms as the defaulted contract, the price of the resale contract would be assumed to be reasonable absent any contrary evidence. However, in light of the additional conditions in the resale contract, the court cannot say, without a trial, that these conditions did not affect the price significantly. *Id.* at 135.

Both parties offer affidavits and/or declarations in support of their summary judgment motions. This "battle of affidavits" highlights the fact that the question of the reasonableness of the price of the Jagger Resale Contract needs the ventilation of a trial. Plaintiff's affiant, Lucien B. Alexander (Alexander), is a consulting forester with a well-known timber consulting firm in the northwest, Mason, Bruce & Girard. Defendant's affiant, William J. Bramwell (Bramwell), is a primary contracting officer for the Willamette National Forest who has an academic and professional background in timber administration, consultation, sales and related activities.

Alexander, in his affidavit, was of the opinion that the resale purchase price should have been higher because timber prices, on average, rose significantly from June 1986, when the Jagger Sale Contract was terminated, until March 1987, when the Jagger Resale Contract was awarded. Thus, Alexander reasons, since the Jagger Resale Contract price did not reflect this general increase in timber prices, he concludes that the condition in the Jagger Resale Contract, *i.e.,* higher downpayment in the Jagger Resale Contract than was the case in the terminated contract, rendered the resale price unreasonable. In reaching this conclusion, Alexander relied on BLM sales.[13]

Bramwell challenges Alexander's use of BLM sales data because he found them not to be comparable to Forest Service sales data. He pointed out that BLM timber was

**13.** Alexander did not rely on Forest Service sales, which ostensibly would seem to be more comparable when analyzing Forest Service timber contracts, because he felt it was easier to tell what purchasers were truly bidding for the timber in BLM sales since there were no purchaser road credits or downpayment deposits in BLM sales to hide what purchasers are truly bidding for the timber. Also, he felt that the mix of timber available on the Jagger Resale Contract, which was heavier to Douglas-fir than was the mix on the terminated contract, should have produced a higher purchase price on the Jagger Resale Contract.

sold on a lump sum basis and Forest Service timber was sold on a volume measurement basis. As a result, Bramwell states, the effect of over-run or under-run in volume estimates can have a marked effect on bidding between these two different pricing methods. Bramwell also felt there were other differences between BLM data and Forest Services data, *e.g.,* scaling methods, time of year of sale, duration of sale contract, timber type and quality, etc. Bramwell felt that Alexander should have looked at sales in the Willamette National Forest since the available sales data base for sales in this Forest Service is larger and more representative of sales trends than for the BLM Eugene District Office. Bramwell analyzed the available Forest Service data and found a moderate upward trend in timber sales prices during the period 1983–1987. Bramwell also explored other general indicators of sale value, *e.g.,* "bid premium," "bid ratio." Bramwell's bottom line was the view that the terminated Jagger Sale sold higher than would be expected whereas the Jagger Resale sold for a price one would expect. Bramwell, finally, noted that the original terminated sale contract had more lower priced wood volume than the Jagger Resale Contract. He felt that in logging the low priced wood, plaintiff maximized his net return for the portion of the sale harvested. However, in the process, he felt plaintiff decreased the bid value of the Jagger Resale Contract.

Bramwell conceded that the conditions in the Jagger Resale Contract, the higher downpayment and midpoint payment requirements, could have served to reduce the purchase price of the Jagger Resale Contract to some degree. Bramwell in his first declaration related how he computed the cost of these conditions for purposes of mitigating the final damage figure to be assessed against plaintiff. Bramwell viewed the cost of these conditions to a purchaser of the Jagger Resale Contract in terms of the time value of money as expressed in interest. In the Jagger Resale Contract, the downpayment was $150,205.32, as compared with $83,000 on the terminated contract. Bramwell used a seven percent figure for a period equal to one-half the contract term to make a calculation as to the downpayment figure. Similarly, he used a seven percent figure for a period equal to one-eighth of the contract term for the midpoint figure. As a result of these calculations, Bramwell arrived at a figure of $15,344, which figure he used to reduce the damages plaintiff would otherwise have been assessed. As a result, plaintiff was not held accountable for the changed terms of the timber resale because the damages assessed were reduced to compensate for these changed conditions. This reduction process is not, *per se,* invalid. *See Appeal of Atlas Mfg. Co. Inc.,* ASBCA No. 15177, 71–2 BCA 9026 (1971).[14] The interest rate of seven percent, used by Bramwell, was the rate established by the

---

**14.** Alexander, in his counter declaration, challenges Bramwell's interest rate effort to translate the changed condition features of the Jagger Resale Contract into dollars so as to reduce the damage assessment against plaintiff. Alexander found no contract language to support such a calculation. He felt that many bidders would be unable to borrow money to make the increased payments called for by the Jagger Resale Contract. Indeed, Alexander notes it was the intention of the 1984 Act, discussed earlier, to eliminate those bidders who could not make these payments. Bramwell, in his second declaration, points out that there were 12 bidders on the terminated contract and there were also 12 bidders on the Jagger Resale Contract. Further, Bramwell points out that in 1987 on timber sales in the Willamette National Forest there was an average of eight bidders per sale. On the Resale Contract at issue, there were 12 bidders. These facts suggest that com-

petition existed relative to bidding on the Resale Contract and support to some degree the view of the Government that the Resale Contract price was competitive and reasonable. *Compare Dillon, supra,* 218 Ct.Cl. at 734. Finally, Alexander felt the seven percent figure was too low in that commercial loans were simply not available at that rate. Alexander also takes issue with Bramwell's discussion relating to "bid premiums" and "bid ratio," and reaffirms his view that BLM sales present a more accurate picture of the true timber market. He is not sure what "Bramwell means when he says that [plaintiff] 'high graded' the sale." He does feel that plaintiff did not selectively log any of the units on the defaulted contract. Relative to Alexander's view above, the court in *FESC, supra,* 5 Cl.Ct. at 779, held that intangibles such as "bid premiums," etc., were taken into account by the damage provision of the defaulted contract, *i.e.,* section B9.4.

United States Treasury Department at the time of the resale (March 1987), and was published in the Federal Register. Bramwell was of the opinion that the principal differences that impacted on the Jagger Resale price were the timber mix that remained on the areas to be logged, resulting from plaintiff's prior selective logging practices at the time of termination, market conditions that existed when the 1984 Jagger Sale Contract was bid, and the changes in market conditions that existed when the 1987 Jagger Resale Contract was bid.

As indicated above, the disputed issue of genuine and material fact is whether, under all the circumstances, the purchase price of the Jagger Resale Contract was reasonable. This fact, and the various factors and aspects attendant thereto, is contested and hotly disputed in the affidavits and declarations filed by the parties. As is obvious from the above discussion, the matter is clearly not one for summary judgment. It is a matter for trial.

■ The parties dispute who has the burden of proof relative to the reasonableness of the timber resale contract price. It has been held that the burden of showing that the Forest Service failed to mitigate damages rests initially on plaintiff as the defaulting contractor. This is so when, inter alia, the claim is that the price of the Jagger Resale Contract was unreasonable. *See* 5 *McBride & Wachtel, Government Contracts*, § 33.60[3] at 33–70, 33–72; *see also Miller v. United States*, 106 Ct.Cl. 239, 249 (1946); *FESC, supra*, 5 Cl.Ct. at 780 ("The burden of proof will shift if the contractor establishes a prima facie case of failure to mitigate.").[15] Plaintiff's position

is that since the Government asserted a counterclaim to recover the damages in question, the burden of proof on mitigation of damages must rest with it. Such is not the case. *See Miller, supra*, 106 Ct.Cl. at 249. *See also FESC, supra*, where, following default by a contractor of a timber purchase contract, the Government counterclaimed for damages and the court held plaintiff had the burden of proof relative to failure to mitigate.[16]

Further, plaintiff must also show that it was prejudiced in some way by the presence in the Jagger Resale Contract of the changed conditions, *i.e.*, the higher downpayment requirement and the midpoint payment requirement. *See Appeal of Skiatron Electronics & Television Corp.*, ASBCA No. 9513, 65–2 BCA 5053 (1965); *Appeal of Aerospace Support Equipment, Inc.*, ASBCA No. 13579, 7101 BCA 8904 (1971). *See also Doehler, supra*.

■ On final word should be added relative to the efforts of the Forest Service to obtain a resale timber contract as a result of plaintiff's breach of the original timber sale contract. First, the Forest Service is given broad discretion in the reprocurement (resale) process. *Astro, supra*, 200 Ct.Cl. at 308, 470 F.2d at 1017. However, that discretion must not be abused, *id.* The test is whether, under all the circumstances, the Forest Service acted reasonably, *id.* In the case at bar there are a number of disputed facts which impinge on whether or not the Forest Service acted reasonably relative to the purchase price of the Jagger Resale Contract. Thus, it is a trial matter, and not one for summary judgment resolution.

---

**15.** If plaintiff shows that the Jagger Resale Contract price was unreasonably low, it may have made out a prima facie case. If so, the burden will shift to the Government to show reasonableness. *See Appeal of Associated Food Servs., Inc.*, ASBCA No. 7678, 62 BCA 3559 (1962). In the case at bar, plaintiff's basic position was that the Forest lost its right to any damages because it improperly computed the damages. Plaintiff made no effort to tie in specifically how, and to what degree, the presence of the changed conditions in the Jagger Resale Contract lowered the purchase price of said Contract. Plaintiff, as indicated above, has the burden of proof to establish how it has been prejudiced and in what amount.

**16.** Even if one were to place the burden of proof on the Government, the case at bar shows that the Forest Service made an effort to mitigate by compensating for conditions which may have affected the purchase price of the Jagger Resale Contract. Under such circumstances, the burden of proof would shift to the plaintiff to establish that the resale price as decreased to account for changed conditions was still unreasonable.

Plaintiff's basic argument that the court should hold that the Government must forfeit its right to all damages is most unpersuasive on the facts of this case. Generally, courts abhor a forfeiture. *See United Buckingham Freight Lines v. Riss and Co.*, 241 F.Supp. 861, 863 (D.Col.1965); *Warner v. United States*, 157 Ct.Cl. 1, 5, 301 F.2d 327 (1962). Further, the fair and reasonable approach under the facts of this case, is that plaintiff should be made to pay for those damages that were incurred by its breach of contract, and it is acceptable to make adjustments, monetary or otherwise, in order to ensure that plaintiff only pays for those damages and no more. *See Ubique Ltd. v. United States*, 224 Ct.Cl. 646, 647 (1980).

The parties, under the circumstances, should give serious consideration to resolution of this case by settlement. As held herein, section B9.4 is the starting point for damage consideration. Defendant presently seeks $583,146 as damages. Under section B9.4, those damages would be reduced to $399,398 ($1,389,036 + $2,400 − $992,-038). Taking into account the effort to attach a dollar figure to the changed conditions in the Jagger Resale Contract would reduce that damage figure to $384,054 (use of seven percent interest). The critical point at trial, presumably, will focus on the purchase price of the Jagger Resale Contract, $992,032. This figure is subject to negotiation and the strengths and weaknesses of the positions of the parties would have been reflective of the give and take of the negotiations. It would have saved time and expense for all concerned if the parties could have resolved the matter by settlement rather than endure a trial and thereafter have a judgment imposed on them that perhaps neither party desired.

### Conclusion

Based on the above discussion, the court denies the summary judgment motions of both parties since there are genuine issues of material fact in dispute. Oral argument was held in this case on June 20, 1989. The court at the conclusion of oral argument advised the parties that settlement of this case might well be in the best interests of all concerned. To this end, the court advised it would withhold issuance of a decision on the motions for summary judgment for a reasonable period in order for the parties to consider settlement. It appears to the court, unfortunately, that settlement is most improbable. The parties have had ample time to consider and reach a settlement if such were to occur. A trial on damages must be held. To this end, the court directs the parties, (inter alia), to prepare, exchange and file with the court on or before January 12, 1990 pretrial proposed findings of fact and briefs, lists of exhibits to be proffered at trial, and lists of witnesses with a brief statement of their expected testimony and whether they are fact or expert witnesses. The parties are directed to communicate with each other and after discussion of the above matters, the parties are to provide the court with a schedule relative to dates when the above submissions should be filed and when and where trial is to be held. Such a schedule shall be filed with the court within thirty (30) days of the date of this opinion.